**STATE of Alaska, Appellant,**

v.

**TANANA VALLEY SPORTSMEN'S ASSOCIATION, INC., and Mark A. Wartes, Appellees.**

**No. 3433.**

Supreme Court of Alaska.

Sept. 8, 1978.

Douglas K. Mertz, Asst. Atty. Gen., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellant.

Lyle R. Carlson, Fairbanks, for appellees.

Donald C. Mitchell, Anchorage, Roger Clark, Fairbanks, and Michael Jeffery, Barrow, Alaska Legal Services Corp., for amicus curiae, Kaktovik City Council of Anaktuvik Pass, City of Wainwright, Barrow City Council, North Slope Borough Assembly, Nunam Kitlutsisti, Mauneluk Ass'n Ru-

ral Alaska Community Action Program, and NANA Regional Corp.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

BOOCHEVER, Chief Justice.

This appeal involves diffuse issues arising out of an emergency regulation promulgated by the Alaska Board of Game (hereinafter the "Board") in response to a drastic reduction in the number of the Western Arctic herd of caribou. The regulation provided that caribou, in certain specified northern areas of the state, be killed only by permit holders, with a limit of 3,000 bull caribou to be taken. A quota of permits was specified for issuance in each of 16 villages. The Department of Fish and Game hired permit agents in the areas involved who, in accordance with verbal instructions, issued permits based in part on actual need for the game.

Suit was brought by the Tanana Valley Sportsmen's Association and Mark A. Wartes to block enforcement of the regulations; and the superior court granted summary judgment to the plaintiffs, restraining the state from issuing permits for the killing of caribou in the areas involved. We have concluded that the issuance of permits based on verbal instructions to the permit agents as to the need of individual applicants does not conform to requirements of the Administrative Procedure Act. Because of this conclusion and the fact that the applicable statute, AS 16.05.257, under which the regulation was promulgated has since been substantially amended, we do not reach issues as to whether the regulations were authorized by the statute or the constitutionality of the regulations and statute. We have concluded, however, that the trial court erred in enjoining the Board from issuing permits for the killing of caribou in the designated areas.

## FACTS

The State of Alaska appeals from an award of summary judgment enjoining the Board of Game from enforcing an emergency regulation passed in September 1976, which authorized permits for the killing of caribou in certain specified areas.

The emergency regulation attempted to address the pronounced and apparently continuing decline in the numbers of the Western Arctic caribou herd, a herd which in 1963 was estimated to number 300,000. By 1975, staff biologists for the Department of Fish and Game reported a reduction to 100,000 animals; and, by the summer of 1976, that number had dropped to 52,000.

On August 13, 1976, the Department announced the emergency closure for human kills of caribou in Game Management Units 23, 24, 26A and 26B, which together extend from the Kotzebue area, including the Kobuk River drainage, across the Brooks Range and Colville River delta, to Prudhoe Bay.[1] The area in question covers the northeastern and northcentral portions of the state and extends south to within 50 miles of the Tanana Valley.

The Department declared the emergency closure[2] in a bulletin in which it also announced a "special meeting" of the Board in Fairbanks on September 20, 1976, for consideration of recommendations for the proposed caribou regulations.[3]

The meeting of the Board of Game was held as scheduled in September of 1976 in

1. While this information regarding the location of Game Management Units 23, 24, 26A and 26B is nowhere in the record or the briefs, it is available from the Department of Fish and Game in a pamphlet entitled "Alaska Game Management Units."

2. The bulletin gave no authority for the closure. 5 AAC 97.015 grants the *Board* the authority to approve an emergency closure but only when recommended by a statutorily-recognized ad-

visory committee. *See* 5 AAC 97.010 and AS 16.05.260. The question of the Department's authority to order the emergency closing is not before us.

3. Proposed Departmental recommendations released in August suggested season restrictions, bag limits of one bull, a ban on the use of meat in barter or in feeding dogs, restriction by area, and regulation by a permit system. Specific

Fairbanks.[4] The Board heard statements and recommendations from a variety of citizens regarding the proposed regulations. According to the minutes of the meeting, a staff biologist, Jim Davis, reported that, if the caribou population were to be stabilized, total predation and human take could not exceed 1,500 adult females.[5] He also reported that there was more latitude in the numbers of males which could be taken without immediately affecting productivity rates.[6]

After considering the biological evidence, the Board took the following actions:

1) required the taking of caribou in Units 23, 24, 26A and 26B to be by permit only;

2) set the season at October 1 to March 31 as then provided by 5 AAC 81.-320(5);

3) required that the permit total not exceed 3,000 bulls;

4) authorized the distribution of the 3,000 permits in 16 villages, specifying the number to be distributed in each village;

5) passed the following proposed amendment to 5 AAC 81.050(17):

[T]he taking of caribou in Units 23, 24, 26A and 26B shall be by permit only and such permits shall be issued by department agents in designated villages. Quotas of permits for each village and persons living outside of villages shall be based on the recommendations of village councils and corporations on the basis of population, need, availability of other food sources and employment, and other factors which may assist in meeting the minimum sustenance needs.

These actions were contained in a set of emergency regulations passed by the Board under authority of AS 16.05.255. AS 44.62.-250 permits an agency to avoid the customary notice and hearing provisions of the Administrative Procedure Act upon a declaration of the existence of an emergency.[7]

regulations proposed by the Department in August included:
a) a limitation on the total harvest by humans to 3,000;
b) an allocation of the permits among 25 villages in the four game management units; and
c) the notice that the permits were to be available on a first-come-first-served basis.
Each permit would be in the form of a locking metal tag to be affixed to the animal upon taking. Thus, only one kill would be authorized for each permit. The proposal also recommended that permits be valid only for a 25 mile radius from issuing villages, that it be made illegal to take or assist in taking big game in the four units in question (in addition to two other units) on any day during which the hunter is airborne, and that all hunters be required to immediately remove the carcass from the field.
Robert Rausch, Director of the Game Division, is quoted in the Bulletin:
The emergency closure and the proposed new regulations are efforts to reduce mortality an permit the herd to regain its former status so that it can once again be a significant factor in the sustenance of Northwest Alaskans.
4. The Board is composed of seven members appointed by the Governor and subject to confirmation by a majority of the members of the Legislature in joint session. AS 16.05.221(b).

5. Davis did indicate, according to a paraphrase in the minutes: "Biologically, and considering the caribou population exclusively, it would be desirable to have zero human utilization."

6. Davis said that the previous year's data indicated 31 bulls older than yearlings per 100 cows, which was a decline from 65 bulls per 100 cows observed in 1970. He stated that there was no great need for concern as long as the ratio did not drop below 15 to 20 bulls per 100 cows.

7. AS 44.62.250 requires that the agency include a statement of facts demonstrating the emergency and showing "that the adoption of the regulation . . . is necessary for the immediate preservation of the public peace, health, safety, or general welfare." The normal notice and hearing requirements are then to be followed after the filing of the emergency regulation. Failure to do so within ten days "automatically repeals the regulation." Notice and hearing provisions are codified in AS 44.62.-190–.210. In addition, no regulation adopted under emergency provisions may remain in effect more than 120 days; however, mere certification by the agency that they gave the required notice and hearing appears to be all that is needed to make the regulation permanent. AS 44.62.260. AS 44.62.270 also declares it to be state policy "that emergencies are held to a minimum and are rarely found to exist."

When the emergency regulations were filed as permanent regulations on October 21, 1976, the sentence pertaining to quotas for villages being based on need was eliminated.[8] The permanent regulations were signed by the Lieutenant Governor on November 29, 1976 and became effective December 29, 1976.

Once the permanent regulations became effective, there remained no statement of a requirement of need as a criterion for issuance of permits in the regulations.[9]

On December 9, 1976, the Tanana Valley Sportsmen's Association and Mark A. Wartes filed suit against the state,[10] asking:

1) that the State be enjoined from issuing any permits for the taking of caribou; and

2) that the court issue an order restraining the State from enforcing the emergency regulation.

The complaint alleged that the eligibility criteria for the permits were racially restrictive in that only members of native corporations were being given permits; that the Department had no authority to issue permits on the basis of need; that the distinction apparently made by the Board

between those in need of caribou and those not in need could not be grounded in the statutory definition of "subsistence hunting" found in AS 16.05.257(h)(1); and that the Alaska and United States Constitutions did not permit such a distinction.[11]

Tanana Valley alleged specifically that "the Department of Game has refused to issue permits for the taking of caribou in Units 23, 24, 26A and 26B, unless the applicant submitted evidence of need." The state, in its response filed January 25, 1977, (after the permanent regulations became effective) admitted this particular allegation.

Plaintiffs moved for partial summary judgment on March 8, 1977 asking for an order restraining the state from enforcing the emergency regulation,[12] which it claimed "requires the issuance of caribou permits based only on a showing of need."[13]

The superior court granted summary judgment on April 6, 1977, and in its opinion stated that "[d]efendant is restrained from enforcing that emergency regulation pertaining to the taking of caribou as adopted in September of 1976 and amended in December of 1976." A final order was

8. The permanent regulation, embodied in 5 AAC 81.050(17), provided:

the taking of caribou in Units 23, 24, 26A and 26B by permit only and those permits shall be issued by department agents in designated villages.

There is no indication in the record that the Board of Game amended the regulation at a regular meeting, or whether the deletion of the second sentence was ever approved by the Board. Apparently, the sentence was eliminated for the reason that the quotas had already been established by the time the permanent regulation was filed.

9. The state admits that the Lieutenant Governor's order in November 1976, amending the regulations passed by the Board in September, deleted language in that emergency regulation pertaining to the requirement that "need" be established prior to the issuance of a permit to hunt caribou.

10. The complaint alleged that Wartes was a resident of the Colville River delta who had been denied any permits to hunt caribou by the Department representative at Nuiqsut "for the reason that Mark A. Wartes was not a member of a native corporation."

11. The plaintiffs also claimed various procedural irregularities in the passage of the emergency regulation: that the regulation was not a) adopted at a regularly scheduled annual meeting of the Board of Game; b) based on biological evidence from the Department; and c) based on a majority vote of the active local advisory committee for the game management units affected. See AS 16.05.257.

12. The memorandum in support of the motion noted that the state had admitted using need as a criterion in its answer of January 1977, filed after the emergency regulation mentioning need had been superseded. Plaintiffs asked for an order that the state cease its apparent compliance with the superseded regulation. The memorandum, however, also appears to ask the court to find the need differentiation practice a violation of the statutory subsistence scheme set forth in AS 16.05.257.

13. In making the motion only a partial one, the plaintiffs were apparently not seeking summary judgment on their other prayer for relief; namely, a permanent injunction from issuing any permits for the taking of caribou.

entered restraining the state from issuing permits authorizing the killing of caribou in Units 23, 24, 26A and 26B.

The superior court judge appeared to rest his decision for summary judgment in favor of the plaintiffs in part on a finding that a need differentiation in the awarding of caribou permits is not authorized by AS 16.05.-257.[14]

On May 6, 1977, the State of Alaska filed a timely notice of appeal.

I

The emergency regulation, as initially promulgated in September 1976, authorized the taking of 3,000 bulls in Units 23, 24, 26A and 26B by permits to be distributed in 16 villages, with a specified number to be distributed in each village. As originally enacted, the regulation included a sentence which stated:

> Quotas of permits for each village and persons living outside of villages shall be based on the recommendations of village councils and corporations on the basis of population, need, availability of other food sources and employment, and other factors which may assist in meeting the minimum sustenance needs.

This sentence, which is at the core of this case, has apparently been construed as authorizing the issuance of permits based on

the need of individual applicants. The state admits that its permit agents received oral instructions and issued the permits based on such individual need. We agree with the superior court that use of such verbal criteria is impermissible.

■ AS 16.05.255 authorizes the Board of Game to make regulations for specified purposes that "it considers advisable" in accordance with the Administrative Procedure Act, AS 44.62. One of the specified purposes is the setting of quotas and bag limits on the taking of game.[15] Establishment of quotas thus must be in accordance with the Administrative Procedure Act.

■ While AS 16.05.257, which authorizes the Board to adopt regulations providing for subsistence hunting, does not specifically refer to the Administrative Procedure Act, it appears clear that it merely sets forth an additional purpose for which regulations may be promulgated. We hold that the regulations promulgated under AS 16.-05.257 must be in accordance with the Administrative Procedure Act. Nothing in that Act authorizes the Board to impose requirements not contained in written regulations by means of oral instructions to agents.[16] Obviously, such verbal additions to regulations involving requirements of substance are unauthorized and unenforceable.[17] For this reason, we affirm the

---

14. The court made several other conclusions, some of which are based on facts claimed to be in dispute in the Statement of Genuine Issues. The judge specifically found that:
1) the biological evidence of the Board meeting in September indicated that a zero human utilization was the most desirable course;
2) it was "clear" that the intent of the original emergency regulation "was to restrict the issuing of permits to members of native corporations";
3) the "crux of the controversy" was:
Does the Game Board have the authority to allocate the resource, i. e., caribou, on the basis of the "needs" of some of the people to the exclusion of the rest at a time when any "human exploitation" of the caribou is unwise from a game management standpoint?
4) it was clear that the actions of the Board violated art. VIII, §§ 2, 3, 4 and 17 of the Alaska Constitution; and
5) even if the Game Board did have the authority to differentiate on the basis of need, it

would still be required to adopt guidelines or regulations "telling why 3,000 permits were issued or explaining reasons for the allotment of a certain number of permits to a certain village or town area."

15. AS 16.05.255(4).

16. See AS 44.62.010–.650.

17. AS 44.62.640(a)(2) defines "regulation" to include:
. . . "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, which have the effect of rules, orders, regulations or standards of general application, and this and similar phraseology shall not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public . . .

court's decision insofar as it prohibited the issuance of permits based on oral instructions regarding need.

## II

The court went further, however, and restrained the state from issuing permits for the killing of caribou in the designated areas. The court apparently based this broader order in part on its conclusion that biological evidence indicated that, if hunting were permitted, the caribou herd would fall below the level of sustained yield.

AS 16.05.257(e) specifies:

No subsistence area may be created under this section if the Board of Game determines that biological evidence indicates that the creation of such an area is likely to adversely affect a resource in that it would fall below the level of sustained yield determined to be adequate.

By establishing subsistence hunting areas, the Board of Game had to conclude that the creation of the area would not so adversely affect the caribou herd. In reviewing the Board's decision, which was a factual one based on its expertise in game management, the court should have applied the reasonable basis test, *Alaska Public Utilities Commission v. Greater Anchorage Area Borough,* 534 P.2d 549, 558–59 (Alaska 1975)—that is, whether there was a reasonable basis for the Board's decision in allowing the issuance of permits for killing 3,000 bull caribou.

The trial court based this portion of its decision on the statement of game biologist Jim Davis that "[b]iologically, and considering the caribou population exclusively, it would be desirable to have zero human utilization." But, Mr. Davis also stated, in substance:

The desirable goal, of course, is to stabilize the population or allow it to increase. Predation and human take could not exceed 1,500 adult females if the population is to stabilize or increase . . . . There is more latitude in what can be done with the bull segment of the population without immediately impacting the rate of productivity. The population still can increase, according to calculations, if the bull increment to the population is exceeded on a short term basis for the next several years.

■ He further indicated that the previous year's bull to cow ratio was about 31 per 100 but that the growth of the herd would not falter as long as that ratio did not drop below 15 or 20 bulls per 100 cows. Even giving consideration to predation, there appears to be a reasonable basis for the Board's decision to allow 3,000 bulls to be killed.

The court's injunction against issuing permits for the killing of caribou in the designated area is therefore reversed.

## III

The trial court further found that there was no statutory authority for issuance of permits based on need. The statute in question, AS 16.05.257, was substantially amended by passage of Ch. 151, SLA 1978. We therefore shall not pass on the statutory authority for increase of permits based on need or on the constitutional challenge to the statute and regulations.[18]

Thus, the oral instructions were "regulations" subject to the provisions of the Administrative Procedure Act.

**18.** This act is effective October 10, 1978. The legislature was addressing important problems of subsistence hunting. For hundreds of years, many of the Native people of Alaska depended on hunting to obtain the necessities of life. To this day, despite incursions by those of different cultures, many Alaska Eskimos, Indians and Aleuts eke out a livelihood by reliance on fish and game. A few non-Natives have adopted similar means of livelihood. *See generally,*

McPhee, *Coming into the Country* (1977). Not only is the game of prime importance in furnishing the bare necessities of life, but subsistence hunting is at the core of the cultural tradition of many of these people. It has been claimed that their very lifestyle is threatened if they are deprived of this traditional method of obtaining the wherewithall for existence. Nelson, "Forest Resources in the Culture and Economy of Native Alaskans," *North American Forest Lands at Latitudes North of 60 Degrees,* Proceedings of a Symposium Held at the University of Alaska, Fairbanks, September 19–22, 1977, at 219–20; Yupiktak Bista, "Does One

AFFIRMED IN PART, REVERSED IN PART.

Way of Life Have to Die So Another Can Survive?" at 76–79 (1974); United States Department of the Interior, *Federal Programs and Alaska Natives,* "Introduction and Summary," pt. B, § 2, at 7 (1974). *See generally,* Nowak, "The Economics of Native Subsistence Activities in a Village of Southwestern Alaska," 30 Arctic 5 (1977); Kelso, "Legal Issues in Federal Protection for Subsistence on the Proposed National Interest Lands," (unpublished) (1976); Alaska Department of Fish and Game, Division of Commercial Fisheries, "Arctic-Yukon-Kuskokwim Region Subsistence Fishery Report," (1972); Mowat, *People of the Deer* (1952). Accommodation of subsistence interests is challenged under the federal constitutional equal protection provision and the state's similar constitutional provision—as well as state constitutional provisions requiring natural resources to be used for the maximum benefit of its people; wildlife to be reserved to the people for common use; and the use of wildlife on a sustained yield principle subject to preferences among beneficial uses. *See* Alaska Constitution, art. VIII, §§ 2, 3 and 4.