Dan JERREL and Viola
Jerrel, Appellants,

v.

STATE of Alaska, DEPARTMENT
OF NATURAL RESOURCES,
Appellee.

No. S–8436.

Supreme Court of Alaska.

March 24, 2000.

Rehearing Denied May 1, 2000.

Robert C. Erwin, Law Offices of Robert C. Erwin, Anchorage, for Appellants.

John T. Baker, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

1. Lease 19581 is dated November 18, 1963. It covers 1,015 acres and extends until November 2018.

2. Lease 21412 is dated January 3, 1964. It covers 440 acres and extends until July 2001. Lease

OPINION

FABE, Justice.

## I. *INTRODUCTION*

State regulations require that holders of state grazing leases mark their livestock. When neighbors complained about the horses on Dan and Viola Jerrel's grazing leases, the Department of Natural Resources terminated the leases on the ground that the Jerrels had failed to brand their horses. Yet neither Alaska statutes nor relevant regulations require that horses be marked with a brand so that these marks may be visible at twenty feet. Because DNR's ad hoc interpretation of the livestock marking requirement is a regulation that was not adopted in accordance with the Administrative Procedure Act, we reverse.

## II. *FACTS AND PROCEEDINGS*

Dan and Viola Jerrel have ranched horses in Alaska since 1963. In that year, the Jerrels entered into a lease with the State for use of ranch land in the Ohlson Mountain area northwest of Homer.[1] During the next eleven years, the Jerrels signed three other leases for land in the same area.[2] Each lease obligates the Jerrels to abide by state land use regulations.

In 1987 Ohlson Mountain area landowners complained to authorities about loose horses causing property damage and posing a safety hazard on their lands. They alleged that these horses belonged to the Jerrels, but the horses could not be identified definitively because they were not marked.

In January 1988 three DNR officials met with the Jerrels and the complaining landowners to discuss various problems, including identification of the horses. In March DNR notified the Jerrels of the complaints and recommended that they deal with the roaming horses, perhaps by fencing. In April and June DNR officials met with the Jerrels to discuss land conditions and compliance with

52922 is dated October 28, 1970. It covers 290 acres and extended until April 1998. Lease 59221 is dated January 12, 1974. It covers 2,040 acres and extends until July 2001.

the lease terms, but they did not discuss marking of the Jerrels' horses.

In November 1989 a neighboring landowner, Ed Bailey, threatened to sue the State for failure to hold the Jerrels responsible for their horses. In December Bailey complained to the State's ombudsman investigator. Bailey also complained to DNR that the Jerrels had not complied with an Alaska regulation requiring that livestock on state grazing leases be marked or branded. In reply DNR informed Bailey that it did not enforce the marking requirements because of the lack of personnel and funding:

> You referred to the requirement under regulations [sic] 11 AAC [Alaska Administrative Code] 60.070 to properly identify animals on grazing leases. This regulation has been in effect since 4/16/70 but due to lack of personnel and funding has never been enforced. Statewide enforcement of this regulation would affect reindeer herds as well as conventional grazing, requiring a significant increase in staffing and funding to administer.

In February and March 1990 Bailey wrote to DNR's commissioner requesting that it take action against the Jerrels. On May 14, DNR officials met with Bailey and other area residents to "discuss their concerns."

As a result of its investigation, the state ombudsman chastised DNR for inefficient enforcement of the Jerrels' lease requirements. The ombudsman recommended that DNR review the lease files for violations, and, "[i]f remedial action as stipulated in the lease agreements (30 days after notification) is not taken by the Jerrels, termination proceedings should begin and be followed through diligently."

Prior to receiving the ombudsman's final report, DNR sent notice to the Jerrels on June 28, requiring them to comply with 11 AAC 60.070[3] by marking their horses and registering the mark with the State Division of Agriculture. The letter further elaborated that the marks must be visible from a distance of twenty feet:

> The Division of Land and Water Management requires (regardless of the method used) that [the] mark must be plainly distinguishable from a distance of 20 feet. Failure to comply within 30 calendar days after service of this written notice shall result in appropriate action including, but not limited to, forfeiture of your leases.

The Jerrels received the letter on July 13.

Shortly after receiving DNR's letter, David Jerrel, the son of Dan and Viola, met with a DNR official to discuss tagging the horses. David proposed a marking system consisting of large plastic tags attached to the horses' manes with monofilament fishing line. The DNR official believed that David Jerrel was acting in good faith to comply with the regulations, and the hearing officer later agreed that "David Jerrel appears to have put a lot of effort into developing this means of marking and it seems like a feasible method."

But on August 10, in response to the ombudsman's report, DNR informed the ombudsman that if the Jerrels did not register a brand, it would terminate their leases. And just two weeks later, on August 24, the agency informed the Jerrels that it had terminated the Jerrels' leases because they had not marked their horses. The termination letter informed the Jerrels that they could request reconsideration if they registered a mark with the Division of Agriculture and proved that their animals were marked.

In September the Jerrels requested an agency hearing and notified DNR that they had marked their horses and registered the mark with the Division of Agriculture. But the Division of Agriculture rejected the Jerrels' method of marking—plastic tags—as impermanent and informed them that they would have to brand or tattoo their horses instead. The director of the Division of Agriculture specified use of a hot brand "that must be burned into the hide of the

---

**3.** 11 AAC 60.070 (1997) requires that:
All livestock permitted on a state grazing lease shall be properly identified and such identification registered in accordance with AS 03.40.010—03.40.270. In addition, the director may require that the livestock be tagged, dyed, or otherwise marked as a control on numbers permitted on a lease in accordance with the annual operating plan.

animal," but added that if the Jerrels were opposed to branding, "the animals may be permanently tattooed, which satisfies the requirement." In response, the Jerrels then proposed an ear tattoo to satisfy the marking requirement. But after writing to inform the neighboring landowners of this proposal and expressing "hope [that] you find this acceptable," the Division of Agriculture rejected the tattoo proposal. It cited concerns of the neighboring landowners that an ear tattoo was unacceptable because it was not clearly visible from a distance.

After a two-day hearing, Hearing Officer Timothy Middleton issued a decision suggesting that DNR give the Jerrels two months to brand or mark their horses. If they failed to do so, he recommended forfeiture of the leases. The decision discussed the merits of a number of marking and branding methods, including hot branding, "freeze dry" branding, ear and lip tattooing, and tagging. The hearing officer acknowledged testimony presented by the Jerrels that branding decreased the value of show horses. Hearing Officer Middleton proposed that DNR require the Jerrels to hot brand the bulk of their horses but permit them to mark up to eight horses with a plastic tag and a lip tattoo. He also invalidated DNR's requirement that all marks be visible from twenty feet, noting that DNR had never validly promulgated this distance visibility requirement as a regulation.

In November 1993 the Jerrels informed DNR that they had marked the horses. But they failed to provide proof of these markings and eventually said that they had moved the horses to Montana. They offered no verification of the move, and state investiga-

tions indicated that the horses probably remained in Alaska.

On November 23, 1994, the commissioner of DNR rejected a number of Hearing Officer Middleton's findings and conclusions and terminated the Jerrels' leases. After they requested reconsideration and their request was denied, the Jerrels appealed the ruling to the superior court. Superior Court Judge Peter A. Michalski affirmed the commissioner's decision. The Jerrels appeal.

## III. DISCUSSION

### A. Standard of Review

 In this case we review whether DNR was required to comply with the procedures prescribed in Alaska's Administrative Procedure Act (APA).[4] This inquiry requires us to examine the meaning of the term "regulation" as defined by the APA in AS 44.62.640(a)(3).[5] Statutory interpretation is a question of law to which we apply our independent judgment.[6] "The standard is appropriate where the knowledge and experience of the agency is of little guidance to the court or where the case concerns 'statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience.'"[7]

The dissent argues for the application of the deferential standard of review that is appropriate when we review an agency's interpretation of its own regulation.[8] But the threshold question in this case is whether the APA applies to DNR's action. Because we must decide whether DNR's twenty-foot visibility requirement is a regulation, we do not defer to the agency's interpretation.[9]

---

**4.** AS 44.62.

**5.** See Matanuska–Susitna Borough v. Hammond, 726 P.2d 166, 182 (Alaska 1986).

**6.** See Payton v. State, 938 P.2d 1036, 1041 (Alaska 1997) ("[I]nsofar as our review [of an agency's regulation] requires us to determine the meaning of [a statute], we exercise our independent judgment.").

**7.** Madison v. Alaska Dep't of Fish & Game, 696 P.2d 168, 173 (Alaska 1985) (quoting Earth Re-

sources Co. v. State, Dep't of Revenue, 665 P.2d 960, 965 (Alaska 1983)).

**8.** Dissent at 145–146 (citing Board of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin., 968 P.2d 86, 89 (Alaska 1998)).

**9.** See Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971). In Kelly, we set out a procedure for the interpretation of administrative regulations. That procedure calls for the deferential standard of review only after a determination that "an administrative regulation has been adopted in accordance with the procedures set forth in the Administrative Procedure Act." Id.

### B. Principles of Estoppel Do Not Bar DNR from Enforcing Marking Requirements.

■ The Jerrels first argue that DNR's failure to enforce the marking regulation for twenty years estops DNR from enforcing it now. DNR responds that it cannot be estopped from enforcing the regulation merely because of its previous inaction. We agree with DNR on this point.

First, the statutory terms of the grazing leases bar the Jerrels' estoppel claims. Each of the leases includes a clause providing that "[n]o failure on the part of Lessor to enforce any covenant or provision herein contained ... shall discharge or invalidate such terms or covenants or affect the right of the Lessor to enforce the same in the event of any subsequent breach or default."

■ Second, Alaska law does not support the Jerrels' claim that DNR is foreclosed from enforcing the marking provisions. To prove a claim of equitable estoppel, a plaintiff must show: "(1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice." [10] The Jerrels fail to meet the first requirement. Although DNR stated several times that it had not enforced the marking requirement in the past, it never affirmatively asserted by word or conduct that it would never enforce the marking requirement. In fact, DNR notified the Jerrels several times that it was currently enforcing the requirements and that they should mark their horses. Consequently, there was no basis for the Jerrels' reliance on DNR's past nonenforcement.

Finally, the superior court correctly noted that the policy implications of allowing the Jerrels' estoppel claim to proceed would be disturbing: "[I]t would be a dangerous precedent to rule that because a statute or regulation went unenforced in the past, for whatever reason, present and future violations could not be sanctioned." Accordingly, we hold that DNR's failure to enforce the regulation in the past did not estop it from enforcing the marking regulations.

### C. DNR Did Not Promulgate the Twenty–Foot Visibility Requirement in Accordance with the APA.

The Jerrels entered into four grazing leases with the State of Alaska and concede that the marking requirements of 11 AAC 60.070 apply to the three most recent leases. We must consider whether DNR acted within its authority in its interpretation and enforcement of the marking requirements.[11]

DNR relied on 11 AAC 60.070 in requiring the Jerrels to mark their horses. That regulation requires that holders of state grazing leases mark their animal in accordance with AS 03.40.010–03.40.270 and allows DNR to require that the holders mark the livestock through tagging, dyeing, or another marking method:

> All livestock permitted on a state grazing lease shall be properly identified and such identification registered in accordance with AS 03.40.010–03.40.270. In addition, the director may require that the livestock be tagged, dyed, or otherwise marked as a control on numbers permitted on a lease in accordance with the annual operating plan.

In turn, AS 03.40.020 deals generally with marking of livestock and sets out procedures for recording a unique brand or mark with the State. If an owner wishes to establish a record of ownership, "[t]he owner may brand or mark an animal on either side with the owner's brand or mark. The animal shall be branded or marked so that the brand or mark shows distinctly." [12]

The regulation contains neither a requirement of minimum visibility nor a mandate of permanence. Yet, in its June 28, 1990 letter to the Jerrels, DNR stated that the Jerrels must use a mark "plainly distinguishable from a distance of twenty feet." When the Jerrels responded by proposing plastic mane

---

**10.** *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984).

**11.** The Jerrels contest the regulations' applicability to the first lease, Lease 19581. We need not reach the merits of this question, however, because we ultimately conclude that DNR was

without authority to require the Jerrels to brand their horses as a requirement of any of their leases.

**12.** AS 03.40.020.

tags, which would have been visible from twenty feet, they were informed by DNR that the tags were insufficiently permanent. At the point that it informed the Jerrels of this permanence requirement, however, DNR retreated from its twenty-foot visibility requirement, informing the Jerrels that if they opposed branding, permanent tattoos would be an acceptable substitute. Yet when the Jerrels proposed ear tattoos, DNR again reversed its position in response to complaints from the neighboring landowners and insisted on brands that would meet the twenty-foot visibility requirement.

The Jerrels contend that in creating the twenty-foot visibility rule, DNR did not interpret its existing marking regulations but rather "established new ones without following the proper procedures."[13] DNR responds that its expertise allows it the power to make policy rules interpreting regulations. We agree with the Jerrels.

■■■ Administrative agencies must comply with the APA guidelines when issuing regulations pursuant to delegated statutory authority.[14] The label an agency places on a policy or practice does not determine whether that rule falls under the APA;[15] the legislature intended for the term "regulation" to encompass a variety of statements made by agencies.[16] Rather, we look to the character and use of the policy or rule. In determining which policies fall under the APA, one of the statutory "indicia of a regulation is that it implements, interprets or makes specific the law enforced or administered by the state agency."[17] A regulation also "affects the public or is used by the agency in dealing with the public."[18] Under these standards, we believe that the twenty-foot visibility requirement is a regulation.

■■■ DNR concedes that it did not promulgate the twenty-foot visibility requirement in accordance with the APA. It claims that it did not need to comply with the APA because the twenty-foot visibility requirement is an informal "policy rule" rather than a regulation. But the requirement includes both core characteristics of a regulation. First, DNR developed the visibility requirement precisely in order to interpret, make specific, and implement the statutory requirement that a mark or brand "show[ ] distinctly."[19] Second, the agency used this requirement not as an internal guideline[20]

---

**13.** The Jerrels also argue that an employee—and not the director—of DNR made the 20-foot visibility requirement, making the decision invalid. But the Jerrels did not raise this issue in their opening brief. Under Alaska Rule of Appellate Procedure 212(c)(3), the reply brief "may raise no contentions not previously raised in either the appellant's or appellee's briefs." We accordingly find that the Jerrels have waived this employee-director argument.

**14.** AS 44.62.640 defines "regulation" as:
[E]very rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; ... "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.

**15.** See, e.g., Gilbert v. State, Dep't of Fish & Game, 803 P.2d 391, 396–97 (Alaska 1990) (rejecting agency's argument that its mixed stocks regulation management was a "policy" and instead classifying it as a regulation subject to the APA because it contained indicia of regulations).

**16.** See Messerli v. Department of Natural Resources, 768 P.2d 1112, 1117 (Alaska 1989) (noting that Alaska law takes an "expansive view" of the term "regulation"), overruled on other grounds by Olson v. State, Dep't of Natural Resources, 799 P.2d 289 (Alaska 1990); see also Kenai Peninsula, 628 P.2d at 905.

**17.** Kenai Peninsula, 628 P.2d at 905; see also AS 44.62.640(a)(3); Gilbert, 803 P.2d at 396.

**18.** AS 44.62.640(a)(3); see also Gilbert, 803 P.2d at 396; Kenai Peninsula, 628 P.2d at 905.

**19.** AS 03.40.020.

**20.** See Messerli, 768 P.2d at 1118 (acknowledging the internal management exception to the requirements of APA).

See also Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State, 628 P.2d 897, 904 (Alaska 1981).

but rather as a tool in dealing with the public. It actually based its decision to terminate the Jerrels' leases upon the fact that the Jerrels did not comply with its "policy." Since the twenty-foot visibility regulation did not satisfy the procedural standards of the APA, it is invalid.[21]

The dissent appears to draw comfort from the fact that DNR's response was "tailored to the Jerrels' livestock,"[22] and thus did not affect the public. But it is the fact that DNR has singled out the Jerrels that concerns us in this case. An agency should not have unfettered discretion to vary the requirements of its regulations at whim. The APA accordingly requires state agencies to follow a rule-making procedure before they may alter or amend the substance of their regulations. "The courts have usually rejected arguments that . . . discretion to proceed by ad hoc orders rather than by rules is necessary to permit an agency to make decisions finely tuned to the facts and circumstances of an individual case."[23] When an agency is freed from the requirement of having to make general rules, this invites the possibility that state actions may be motivated by animosity, favoritism, or other improper influences.[24]

The dissent also argues that because DNR had already issued a marking regulation, its adoption of the twenty-foot visibility requirement "did not alter the substance of what the Jerrels were already required to do" but merely "specified how they were to comply with the regulation."[25] But the APA does not recognize the dissent's proposed distinction between promulgating new regulations and supplementing or making more specific existing ones. Indeed, the statute defines regulations subject to the act as including "the amendment, supplement, or revision" of a rule or regulation in order to "make specific" the law enforced.[26] Because the twenty-foot requirement "supplemented," "revised," and "made specific" the marking requirements of 11 AAC 60.070, DNR was required to follow APA procedures.[27]

DNR argues in the alternative that even if the twenty-foot visibility requirement is invalid, it acted within its authority in terminating the Jerrels' leases because they did not mark their horses at all. But DNR's shifting interpretations of the meaning of the marking requirements hampered the Jerrels' attempts at compliance. And although the dissent argues that the Jerrels' failure "to follow any reasonable, effective alternative"[28] to branding justified DNR's cancellation of the leases, this statement ignores the finding of the hearing officer. Hearing Officer Middleton found that the tagging method proposed by the Jerrels "seem[ed] like a feasible method."[29] Indeed, until August of 1990, DNR believed that the Jerrels had worked in good faith with DNR to come up with a feasible marking method. Moreover, the Director of Agriculture offered the Jerrels the option of tattoos in lieu of brands in October 1990 and withdrew that offer only after learning that it would be unacceptable to the neighboring landowners. As Greek Taylor, Natural Resource Manager with the State

---

**21.** *See Wickersham v. State Commercial Fisheries Entry Comm'n,* 680 P.2d 1135, 1140 (Alaska 1984) ("When a policy is invalidly promulgated under the APA, generally the appropriate remedy is to invalidate the offending policy until the procedures required by the APA are observed.").

**22.** Dissent at 147.

**23.** Alfred C. Aman, Jr. & William T. Mayton, Administrative Law § 3.2, at 78 (1993).

**24.** *See* Alfred C. Aman, Jr. & William T. Mayton, Administrative Law § 3.1, at 73 (1993) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 373, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

**25.** Dissent at 148.

**26.** AS 44.62.640.

**27.** *See* AS 44.62.640; *Gilbert,* 803 P.2d at 396–97 (When "the Board policy makes more specific the law enforced or administered and the policy affects the public, . . . we conclude that the policy in question falls squarely within the definition of a 'regulation' contained in AS 44.62.640(a)(3) and, therefore, it is required to be implemented pursuant to the APA.") (internal punctuation omitted).

**28.** Dissent at 149.

**29.** Although the hearing officer required branding of some horses, he recognized the decrease in value that branding causes and recommended that the Jerrels be allowed to mark up to eight potential show horses with plastic tags and lip tattoos.

Division of Lands, testified at the June 1992 hearing:

Q: At any time during the course of your dealing with David [Jerrel], over the course of that summer, did he seem less than cooperative?

A: Absolutely not.

Q: Did he seem like he was sincerely working toward fulfilling the requirements concerning marking the livestock?

A: Yes.

Thus, the evidence does not support the dissent's view that the Jerrels failed to make a good faith attempt to comply with the regulation.

## IV. CONCLUSION

We hold that DNR was not estopped from enforcing the marking requirement. But because DNR's requirement that the Jerrels brand their horses so that the marks may be visible at twenty feet was not promulgated under the APA, we REVERSE the decision of the superior court to terminate the Jerrels' leases for noncompliance with that requirement.[30]

EASTAUGH, Justice, with whom CARPENETI, Justice, joins, dissenting.

## I. INTRODUCTION

Because I think the Department of Natural Resources (DNR) had authority to require the Jerrels to mark their horses visibly and permanently, I dissent.

The Jerrels kept about thirty-five horses on DNR grazing leaseholds. DNR received complaints alleging that the Jerrels allowed their horses to run wild through the countryside, destroying neighbors' lawns and fields, breaking fences, endangering traffic, instigating threatening situations, imperiling children, and possibly causing a shootout and a death.

In response to the complaints, DNR, through its Division of Land and Water Management, invoked 11 Alaska Administrative Code (AAC) 60.070 (1970) and required the Jerrels to mark their horses by means plainly distinguishable at twenty feet. DNR eventually terminated the Jerrels' leases because they failed to mark their horses. After a hearing, DNR concluded that even absent the twenty-foot visibility requirement, only branding provided a sufficient means of identification. The Jerrels again failed to comply and DNR affirmed the termination.

This court reverses, holding that the DNR's Division of Land and Water Management's "ad hoc interpretation of the livestock marking requirement is a regulation that was not adopted in accordance with the Administrative Procedure Act."[1] The court also rejects DNR's alternative argument that it permissibly terminated the leases because the Jerrels did not mark their horses in any fashion.[2]

I disagree with both of the court's conclusions.

## II. DISCUSSION

### A. Standard of Review

Whether agency action is a regulation is a question of law that does not involve agency expertise.[3] We therefore substitute our judgment for that of the agency.[4] An agency's interpretation of its own regulation, however, is reviewed under a reasonable basis standard and is normally given effect unless it is plainly erroneous or inconsistent with the regulation.[5] And we describe an agen-

---

**30.** Our conclusion that DNR did not comply with the APA makes it unnecessary to reach the Jerrels' claims that the branding requirement conflicted with applicable statutes, that termination of their leases violated their due process rights under both the Alaska and Federal Constitutions, or that the May 14 meeting with neighboring landowners violated the Open Meetings Act.

**1.** See Op. at 139.

**2.** See Op. at 144–145.

**3.** See Kachemak Bay Watch, Inc. v. Noah, 935 P.2d 816, 825–26 (Alaska 1997).

**4.** See id. at 821.

**5.** See Board of Trade, Inc. v. State, Dep't of Labor, 968 P.2d 86, 89 (Alaska 1998).

cy's discretionary decision that does not require formal procedures as "quasi-executive" and apply an abuse of discretion standard.[6]

### B. DNR's Action Was Not a "Regulation."

Did DNR's interpretation of its regulation offend the Administrative Procedure Act [APA]? The answer lies in whether the interpretation was itself a "regulation." [7]

The statutory authority for the state's governance of its leased grazing lands lies in AS 38.05.020, which permits DNR's commissioner to "establish reasonable procedures and adopt reasonable regulations necessary to carry out" the lands chapter, and AS 38.05.070, which requires the director of DNR's Division of Lands (now the Division of Land and Water Management) to determine the limitations, conditions, and terms of state leases.

Those two statutes gave DNR authority to determine reasonable lease conditions and to adopt reasonable regulations. DNR duly promulgated the regulation disputed here, 11 AAC 60.070, some seventeen years before the present dispute arose. The first sentence of that regulation states that all livestock on a state grazing lease "shall be properly identified" and that the identification shall be registered in accordance with AS 03.40.010–.270. The second sentence delegates discretion to the division director who, under his proprietary authority, "may require" that livestock on a state grazing lease "be tagged, dyed, or otherwise marked as a control on numbers permitted on a lease in accordance with the annual operating plan." [8]

All four of the Jerrels' leases required the leaseholder to comply with regulations promulgated under the lands chapter.

When applying 11 AAC 60.070 to the Jerrels, the division stated that to be "properly identified," the Jerrels' range horses must be identifiable at a distance of twenty feet. The court here decides that the division's application of 11 AAC 60.070 to the Jerrels was a "regulation." In doing so, it states that "DNR developed the visibility requirement precisely in order to interpret, make specific, and implement the statutory requirement that a mark or brand 'show[ ] distinctly.' " [9] But I think more analysis is required to decide the issue presented. In numerous cases we have undertaken a more analytical approach before deciding whether an agency's action is a regulation that must be promulgated under the APA.[10] Today's opinion fails to note the substantive distinctions between agency action that is regulatory and agency action that simply interprets an existing regulation and applies that regulation to the circumstances at hand. It also fails to note the distinction between the regulatory authority of DNR and the proprietary authority of the DNR division charged with managing these leases. To adequately analyze DNR's action here, we must address those distinctions.

Agency action creates a regulation when it establishes a future course of conduct, has the effect of a standard of general application, or makes an addition of substance to an existing policy or regulation.[11] But agency

---

**6.** See Kodiak Seafood Processors Ass'n v. State, 900 P.2d 1191, 1197 (Alaska 1995) (citing Olson v. State, Dep't of Natural Resources, 799 P.2d 289, 292–93 (Alaska 1990)); see also Kachemak Bay Watch, 935 P.2d at 825.

**7.** See AS 44.62.640(a)(3).

**8.** 11 AAC 60.070 provides in full:
All livestock permitted on a state grazing lease shall be properly identified and such identification registered in accordance with AS 03.40.010–03.40.270. In addition, the director may require that the livestock be tagged, dyed or otherwise marked as a control on numbers permitted on a lease in accordance with the annual operating plan.

**9.** Op. at 143.

**10.** See, e.g., Kachemak Bay Watch, 935 P.2d 816; Usibelli Coal Mine, Inc. v. State, Dep't of Natural Resources, 921 P.2d 1134 (Alaska 1996); Gilbert v. State, Dep't of Fish & Game, 803 P.2d 391 (Alaska 1990); State v. Northern Bus Co., 693 P.2d 319 (Alaska 1984); Kenai Peninsula Fisherman's Coop. Ass'n v. State, 628 P.2d 897 (Alaska 1981); State v. Tanana Valley Sportsmen's Ass'n, 583 P.2d 854 (Alaska 1978).

**11.** See Gilbert, 803 P.2d at 396–97 (concluding that agency policy limiting fishery before escapement goals were met was regulation because it modified commercial fishery limits); Kenai Peninsula Fisherman's Coop., 628 P.2d at 905–06, 905 n. 20 (holding that agency classification was regulation subject to APA because it intended to regulate future conduct affecting fishery rights by

action does not create a regulation when it implements existing policy decisions and is not plainly erroneous or inconsistent with an existing regulation.[12] And agency action does not constitute a regulation when it merely conditions an existing right.[13]

The agency's action here was not the equivalent of a new regulation. The division did not create a standard of general application when it wrote its June 28, 1990, letter to the Jerrels, or at any later time in dealing with the Jerrels. The June 28 letter simply stated that the division "requires (regardless of the method used) that your mark must be plainly distinguishable from a distance of 20 feet." It referred to "your" mark, not the marks of all leaseholders. It did not publish that letter and there is no evidence it has since relied on it with respect to other leaseholders, or has treated it as having general application. Rather, as the court acknowledges, the marking requirement was in response to circumstances specific to the Jerrels' horses, namely the complaints of neighbors that the horses were loose and created hazards.[14]

Moreover, the marking requirement applied to the Jerrels did not establish a future course of conduct; DNR did not issue a directive requiring all leaseholders to brand their livestock or adhere to a twenty-foot visibility standard, regardless of their livestock's history or characteristics. Instead, the agency simply applied existing agency policy—that all livestock on state grazing leases be marked for identification—to the

circumstances presented. It did not intimate that it would impose the same technical requirements on all leaseholders, regardless of circumstances. Indeed, a twenty-foot visibility might be needless for docile and easily gathered species, and insufficient for beasts more feral than the Jerrels'. And hot-branding would be useless for species with long coats. The very reason why the division even acted here, to deal with claims that these leaseholders' animals were dangerous and destructive, suggests a case-specific interpretation of the existing marking regulation. And the court's own characterization of the interpretation as "ad hoc"[15] is at odds with an intent to adopt a twenty-foot visibility requirement of general application.

For similar reasons, I disagree with the court's assertion that the division's action was a regulation because it affected the public.[16] Its "ad hoc" interpretation[17] was adopted for a specific purpose. The interpretation tailored to the Jerrels' livestock does not affect the public. DNR's directive here was not directed to the public, but to the Jerrels only: the twenty-foot visibility requirement was expressed in an agency letter sent only to the Jerrels; branding was recommended as a result of the Jerrels' individualized agency hearing; and DNR Commissioner Noah affirmed that recommendation after reviewing the Jerrels' particular circumstances. DNR did not publish or communicate to the public either the twenty-foot visibility requirement or the branding requirement. And DNR did not require other leaseholders or "the public" to abide by ei-

establishing salmon use priority); *Tanana Valley Sportsmen's Ass'n,* 583 P.2d at 858–59 (holding that verbal requirement of "need" not contained in hunting regulation was addition of substance and thus regulation under APA).

12. *See Usibelli Coal Mine,* 921 P.2d at 1148–49, 1149 n. 24 (holding that agency decision calculating royalties was not regulation because it did not involve making of policy decisions and did not make addition of substance); *Northern Bus Co.,* 693 P.2d at 323 (concluding that agency directive to use certain standard in awarding contracts was not regulation when agency had repeatedly required that standard and when standard was consistent with existing regulation).

13. *See Messerli v. Department of Natural Resources,* 768 P.2d 1112, 1117–18 (Alaska 1989)

(concluding that policy manual was not regulation because definitions in manual merely conditioned already existing right), *overruled on other grounds by Olson v. State, Dep't of Natural Resources,* 799 P.2d 289, 292–93 (Alaska 1990) (holding that rational basis test used in *Messerli* was incorrect and employing abuse of discretion standard of review for discretionary acts not requiring formal procedures to allow agencies latitude to act commensurate with their discretion).

14. *See* Op. at 143–144.

15. *See* Op. at 139.

16. *See* Op. at 143–144.

17. Op. at 139.

ther standard. DNR's actions do not govern the actions of any individuals aside from the Jerrels.[18]

DNR's existing policy, reflected in 11 AAC 60.070, requires identification "so that the brand or mark shows distinctly." [19] It requires all livestock on a state grazing lease to be "properly identified." [20] Requiring the Jerrels to brand or visibly mark their horses is neither plainly erroneous nor inconsistent with that regulation.

Under the regulation and the terms of their lease, the Jerrels were already obliged to identify their livestock. Requiring branding, as opposed to allowing a different type of marking, did not affect or add to the substance of that obligation. Requiring branding merely altered the way in which the Jerrels had to satisfy that obligation. The regulation gave the division discretion to require an adequate method of marking. This discretion allowed the division to administer state leases and to prevent activities on its leaseholds from harming the public. It also gave the division the flexibility to respond to specific circumstances arising on state leases.

The court also reasons that because the division's visibility requirement "supplemented," "revised," and "made specific" the marking requirements of 11 AAC 60.070, DNR was required to follow APA procedures.[21] First, as discussed above, the division's requirement did not alter the substance of what the Jerrels were already required to do, although it specified how they were to comply with the regulation. Second, even if the division's action were an additional requirement, 11 AAC 60.070 authorizes it to impose additional marking requirements on a lease-specific basis.[22] DNR's commissioner interpreted 11 AAC 60.070 as giving the division proprietary authority, as a lessor, to impose

additional marking requirements on particular leases. He stated:

> "In addition," the regulation expressly provides for the director of the Division of Land to impose supplementary, lease-specific marking requirements. If the director decides to impose extra marking requirements on a particular lease, he must do so by giving notice to the lessee in question, not by adopting a regulation of general applicability. 11 AAC 58.580. I find that the Division of Land was within its legal rights as lessor to impose the additional requirement that whatever mark the Jerrels used must be visible at 20 feet.

Although an agency's characterization of whether it has effectively adopted a new regulation is not entitled to deference, I agree with the commissioner's reasoning because it accords with our previous distinctions between regulatory and non-regulatory agency action. It also accords with the distinction between delegated sovereign and proprietary authority.

The legislature delegated no sovereign authority to the division—the entity that the court here holds created a "regulation." [23] As the commissioner noted in his decision, when the legislature gave the division responsibility for leasing state-owned land, it granted the division no powers beyond the proprietary authority available to any private landowner, including the ability to enter into and terminate contracts pertaining to those lands.[24] The division was acting here in its proprietary role as the lessor of state lands.

We have described an agency's discretionary decision that did not require formal procedures as "quasi-executive." [25] This court has previously stated that "DNR regularly makes decisions that are quasi-executive in

---

18. *See Kodiak Seafood Processors,* 900 P.2d at 1197 (agency action was not regulation when it affected only one individual).

19. AS 03.40.020; *see* 11 AAC 60.070.

20. 11 AAC 60.070.

21. Op. at 144.

22. *See* 11 AAC 60.070.

23. *See* AS 38.05.035.

24. *See* AS 38.05.005 (establishing Division of Lands); AS 38.05.020(b)(1) (stating that DNR Commissioner may adopt reasonable regulations); AS 38.05.035 (showing that Division of Lands director has not been delegated regulatory authority).

25. *See Kachemak Bay Watch,* 935 P.2d at 825; *Kodiak Seafood Processors,* 900 P.2d at 1197.

nature and do not constitute regulation under the APA even when one or more indices of a regulation are present."[26] And when an agency makes quasi-executive discretionary decisions authorized by the legislature we review only for abuse of discretion.[27] The court should therefore review the division's action here only for abuse of discretion.

The remaining question is whether the division abused its discretion. I conclude that requiring the Jerrels to visibly mark their livestock was a reasonable and not arbitrary exercise of administrative discretion. The complaints concerning the Jerrels' horses warranted a visibility requirement and justified the division's conclusion that it was necessary to be able to identify the beasts from a reasonably safe distance. In requiring permanent and visible marks, the division could permissibly consider the danger that large, ill-tamed animals pose to observers trying to discern small marks, the Jerrels' past failures to contain and account for their horses, and the need to identify the horses to determine under- or over-utilization and to create a range conservation plan. Given these circumstances, the division could justifiably invoke the regulation and its own discretion to require visible markings in a form that prevented their removal or transfer. DNR here concluded that branding was practical because it was both permanent and visible. A practical solution to a problem is reasonable and not arbitrary.[28]

The court's holding here would require DNR to promulgate a new regulation each time it deals with leaseholders who do not wish to follow state regulations or the terms of their leases. According to the court, to lawfully manage the Jerrels' lease, DNR should have promulgated a specifically tailored regulation allowing hot-branding of horses or a specific twenty-foot visibility re-

quirement. I would not saddle DNR with such an obligation. Such a requirement would seem to mandate promulgating immutable standards such as a ten-foot visibility requirement for Shetland ponies and sheep, a twelve-foot standard for calves, and a thirty-foot standard for longhorn steers. The legislature apparently disagreed with any such notion when it gave DNR and the division discretion to manage individual leases and to set the terms and conditions of those leases. That discretion is not unbridled, but it was not exceeded here. The court's holding today effectively prevents agencies from interpreting their own regulations or contracts and from exercising their delegated discretion to resolve disputes, unless they promulgate new regulations filling the inevitable interstices in existing regulations.

### C. DNR Did Not Err when It Terminated the Jerrels' Leases for Failing to Comply with 11 AAC 60.070.

The court rejects DNR's argument that the Jerrels' total failure to mark their animals justified terminating the leases.[29] The Jerrels' failure had two effects. It prolonged the difficulties in holding them responsible for their animals. And their failure to follow any reasonable, effective alternative—a mark large enough to be read by an observer at a safe distance and permanent enough to prevent identity-switching—confirms that a permanent, visible mark was a reasonable, permissible, administrative choice within the agency's discretion.

The court asserts that DNR's "shifting interpretations" of the meaning of the marking requirement hampered the Jerrels' attempts at compliance and thus that their total non-compliance must be excused.[30] But DNR only "shifted" its meaning to allow the Jerrels to propose a feasible alternative.

**26.** *Kachemak Bay Watch,* 935 P.2d at 825–26.

**27.** *See id.* (holding that DNR's exercise of task assigned to it by legislature invariably involved exercise of agency discretion and did not constitute regulation under APA nor abuse of discretion); *Kodiak Seafood Processors,* 900 P.2d at 1197–98 (holding that issuance of commercial fishing permit for closed waters to one individual was not regulation and was not abuse of discretion).

**28.** *See State v. Anderson,* 749 P.2d 1342, 1346 (Alaska 1988) (holding that agency's practical method for accomplishing its goal of safe disposal systems was reasonable and not arbitrary).

**29.** *See* Op. at 144–145.

**30.** *See id.*

The Jerrels bore the responsibility for identifying some other method of equivalent visibility and permanence that would satisfy DNR's duty to administer these leases and protect other persons and landowners. Before mandating branding, DNR allowed the Jerrels two years to propose a workable alternative. The Jerrels proposed tattooing and a plastic tagging method. After seriously considering these alternatives, the hearing officer ultimately rejected them as not sufficiently permanent or visible.[31] The fact that DNR gave the Jerrels two years to come up with an alternative solution—from 1990 to 1992—does not excuse the Jerrels' complete failure to provide evidence that their horses had been branded. Even after the branding requirement was clarified, the Jerrels were given two more years to comply before the leases were finally terminated in 1994. The court's opinion notes that DNR believed that the Jerrels worked with it in good faith until 1990.[32] But by failing to consider the Jerrels' subsequent four years of promises, delays, and total non-compliance before DNR terminated the leases, the court fails to give the required deference to permissible agency action.

The court's opinion expresses concern that DNR "singled out" the Jerrels and implies that DNR varied "the requirements of its regulations at a whim."[33] First, DNR did not single out the Jerrels. Their actions prompted individualized attention. DNR had authority to interpret its regulation as it did, and a duty to rein in the Jerrels' animals. The record strongly suggests that DNR worked in good faith, dealing patiently with both the Jerrels and their neighbors. Second, unless DNR had absolutely no authority to interpret its regulation on a lease-by-lease basis, it seems inconsistent to reason that a requirement specific to the Jerrels could somehow be a regulation of general application.

### D. *The Jerrels' Other Arguments Fail.*

Given this conclusion, I would reach the Jerrels' Open Meetings Act[34] and due process arguments because they would no longer be moot.

There was no Open Meetings Act violation; DNR simply listened to public complaints about loose horses. Any information gathered by DNR as a result of those investigations was not conclusive on any issue in dispute before the hearing officer or the commissioner.

The Jerrels did not preserve their procedural due process issues at the agency stage. They first raised them in their reply brief in their superior court appeal. That is too late. They did not claim, at a time when the agency could do something about it, either that DNR gave them inadequate notice or that the hearing was deficient. I would not consider the due process issues to be so important as to establish plain error that could justify reviewing these unpreserved issues. In any event, the Jerrels received a full hearing before a hearing officer and had an opportunity to present evidence bearing on, among other things, what marks and brands might be sufficient. And they had ample opportunity following the hearing officer's decision to fulfill the branding requirement.

## IV. CONCLUSION

I would therefore affirm.

---

**31.** Although he noted that the tagging alternative "seems like a feasible method," the hearing officer ultimately recommended that the Jerrels be required to hot brand most of their horses because "none of the other methods offers sufficient means of identification." He recommended that the Jerrels be allowed to identify up to eight horses, whose show value would be reduced by a hot brand, with tags and permanent tattoos. These particularized alternatives were not specified by the regulation, either, and would seem to violate the same promulgation standards the court relies on today.

**32.** *See* Op. at 145.

**33.** Op. at 144.

**34.** *See* AS 44.62.310–.312.