222 P.3d 851 (2010)
Rory F. BURKE, Appellant,
v.
HOUSTON NANA, L.L.C., Lumberman's Mutual Casualty Co., and the Alaska Workers' Compensation Board, Appellees.
No. S-12346.
Supreme Court of Alaska.
January 8, 2010.
*853 William J. Soule, Law Office of William J. Soule, Anchorage, for Appellant.
Patricia L. Zobel, DeLisio Moran Geraghty & Zobel, PC, Anchorage, for Appellees.
Before: FABE, Chief Justice, MATTHEWS, Eastaugh, and CARPENETI, Justices.

*854 OPINION

CARPENETI, Justice.

I. INTRODUCTION
An employee was injured three times over the span of five months while working as a pipe fitter for his employer. The employee fell twice, injuring his lumbar and cervical spine and his hip, and also complained of sharp pain in his right hand that doctors attributed to his work. After he was laid off from his Alaska job, the employee returned to his home in California, where he began chiropractic treatment for his spinal injuries. His employer initially paid benefits without an award; it filed a notice of controversion after its experts reported that the employee was medically stable and no longer in need of treatment. The Alaska Workers' Compensation Board held a hearing on the employee's claim for medical and disability benefits and decided that the employee was entitled to limited chiropractic benefits, denied the rest of his claims, and awarded him limited attorney's fees. The employee, through his attorney, also requested a reemployment eligibility evaluation. The Reemployment Benefits Administrator (RBA) determined that the employee was eligible for an evaluation. The employer appealed the RBA's decision to the board; the board found that the employee had filed his request too late and denied it.
The employee appealed both decisions to the superior court. The superior court affirmed the board's decisions in most respects. We reverse the board's denial of temporary total disability benefits, its denial of reimbursement for travel costs, and its reversal of the RBA's decision, and affirm the board's decisions on all remaining issues.

II. FACTS AND PROCEEDINGS
Rory Burke was employed as a pipe fitter on the Alaska pipeline for many years, working about half the year in Alaska and spending the rest of the year at his home in California. Burke worked for Houston NANA, L.L.C.[1] off and on for two years. In June 2001 he fell when he stepped in a hole that was covered with wood chips while he was carrying an eighty-pound load down a hill near Glenallen. He strained his hip and shoulder but did not take time off work or file a report of occupational injury form.[2] In mid-August he again injured himself when he stepped into a hole created when a large rock was moved. Finally, during the night of October 16, severe cramping and numbness in his right hand woke him up. He attributed the hand pain to work he had been doing, lifting a heavy beam and bolting heavy Teflon pads in place and operating an impact gun. He went to an urgent care clinic in Fairbanks on October 25, 2001, complaining of neck pain for the previous three months and cramping in his right hand. The doctor at the clinic diagnosed right epicondylitis[3] and cervical neck strain, wrote that the conditions were work-related, and limited Burke to lifting no more than forty pounds. Burke signed a report of occupational injury on October 30, 2001. He was laid off work the same day as part of a reduction in force. Burke returned to California in early November. Houston NANA paid workers' compensation benefits without an award effective November 19, 2001.
On November 19, 2001, Burke saw Dr. Joel Taatjes, a chiropractor in Petaluma, California, for treatment related to his work injuries. At that time, Dr. Taatjes completed a California workers' compensation form entitled "Doctor's First Report of Occupational Injury." Dr. Taatjes's report estimated that Burke's treatment would require approximately thirty visits over a twelve- to sixteen-week period, or between two to three visits per week. However, Burke received almost *855 daily treatments from Dr. Taatjes for about three weeks and then treatments two or three times a week for another thirty weeks or so. During the course of his treatment of Burke, Dr. Taatjes sent Houston NANA progress reports on forms from the State of California Division of Workers' Compensation. Each form included a place for the doctor to detail the treatment plan, including the methods, frequency, and duration of planned treatments. Dr. Taatjes described the therapy he was conducting, but did not specify the number or duration of treatments. He simply indicated "decreasing frequency as the patient's status improves."
Houston NANA arranged for a panel of doctors to conduct an independent medical evaluation (IME) on March 19, 2002. The panel consisted of a chiropractor, Dr. Willat, and an orthopedic surgeon, Dr. Ramsey. Both doctors examined Burke and reviewed his medical records. Both agreed that Burke was medically stable, at least with respect to his spinal injuries. Dr. Ramsey diagnosed Burke with mild right carpal tunnel syndrome and indicated that Burke's work had caused his neck, back, and carpal tunnel problems on a more-probable-than-not basis. In Dr. Ramsey's opinion, Burke had a slight permanent partial impairment but could return to his work as a pipe fitter as long as he was not required to use vibrating equipment on a sustained basis because of the carpal tunnel problems. Dr. Ramsey rated Burke as having a two percent whole person permanent impairment as a result of the carpal tunnel syndrome. Dr. Ramsey thought that Burke might need future medical care for his carpal tunnel syndrome, although he did not see a need for immediate medical care. Both Drs. Ramsey and Willat felt that further passive chiropractic treatments like the ones Burke was receiving from Dr. Taatjes were not necessary.
After the IME reports noted that Burke might have carpal tunnel syndrome, Dr. Taatjes referred Burke to a neurosurgeon, Dr. Guy Corkill. Dr. Taatjes evidently believed that the hand complaints were related to Burke's neck injuries and wanted Dr. Corkill to identify the reason for the continuing pain. Dr. Corkill examined Burke on May 28, 2002, diagnosed cervical disk disease, and referred Burke to Dr. Marcia Luisi, a specialist in physical medicine and rehabilitation, for electrodiagnostic studies. Dr. Luisi examined Burke on June 18, 2002, and performed nerve conduction studies to determine the cause of his right hand complaints. Dr. Luisi concluded that Burke had moderate right carpal tunnel syndrome and that the electrodiagnostic studies showed no indication of cervical radiculopathy. Following Dr. Luisi's report, Dr. Corkill recommended that Burke get a wrist splint. On August 23, 2002, Dr. Corkill advised Burke to have surgery for his carpal tunnel syndrome. Dr. James Glynn, an orthopedic surgeon, evaluated Burke on October 2, 2002, and recommended right carpal tunnel release. Burke had the surgery on November 18, 2002.
Dr. Taatjes referred Burke to Dr. Don Davis, a chiropractic neurologist, for a "permanent and stationary evaluation" on September 19, 2002. Based on his examination of Burke and his review of the medical records, Dr. Davis believed that Burke was permanent and stationary, except for his right hand. He stated that in his opinion, Burke's chiropractic treatment up to that time had been appropriate and should continue on an "exacerbation basis." Dr. Davis did not feel that Burke could return to his work as a pipe fitter, noting restrictions on his ability to bend, lift, carry, push, pull, and squat. Dr. Taatjes adopted the report as his own.
Houston NANA filed a notice of controversion on May 3, 2002, based on the IME reports. It controverted temporary total disability (TTD) benefits after May 1, 2002, and all further chiropractic care and physical therapy. The controversion noted that the IME doctors had determined that Burke was medically stable as of March 19, 2002; it also stated that medical care for Burke's right carpal tunnel condition "as outlined in Dr. Ramsey's EME report" would be covered. A copy of the controversion notice was sent to Dr. Taatjes.
Burke filed a workers' compensation claim on June 26, 2002. In his claim, he requested TTD benefits from May 2, 2002 through medical stability, permanent partial impairment benefits, medical costs related to Dr. *856 Taatjes's care, transportation costs, penalties, interest, and attorney's fees. Houston NANA filed its answer to the claim on July 15, 2002.
Burke requested that the Alaska Workers' Compensation Board (the board) order a second independent medical evaluation (SIME) to address issues of treatment, functional capacity, and medical stability. Houston NANA agreed that an SIME was appropriate in Burke's case, so the board ordered one. Two SIME physicians evaluated Burke: Dr. Marvin Bloom, an orthopedic surgeon, and Dr. Scott Calzaretta, a chiropractor. Dr. Bloom stated that Burke would not improve further without cervical fusion surgery and that even with neck surgery, Burke would likely not be able to return to his former work as a pipe fitter. Dr. Bloom did not feel that further chiropractic treatment was indicated; he believed that Burke was medically stable as of December 2002. Dr. Bloom rated Burke as having an eight percent whole person impairment related to his spinal injuries. He did not specifically discuss the carpal tunnel syndrome in the conclusions in his report.
Dr. Calzaretta thought that limited chiropractic treatment was still appropriate in Burke's case but that the frequency of treatment needed to be decreased to one to two times a month rather than two to three times a week. Dr. Calzaretta agreed with Dr. Willat that Burke was medically stable with respect to his spinal injuries as of March 19, 2002. Dr. Calzaretta felt that Burke could return to work as a pipe fitter as long as he was "precluded from repetitive pneumatic activity with his right hand." He also thought that Burke should lift no more than forty pounds overhead to prevent possible injuries to his neck and back.
The board held a hearing on Burke's claim on September 4, 2003. Burke testified in person, and Dr. Taatjes testified telephonically. Burke argued that his treatment with Dr. Taatjes was reasonable and necessary, even though it was in excess of the treatment limits, because he had multiple injuries but continued to work and because the chiropractic care helped him avoid surgery and expensive pain medication. He also asserted that Houston NANA had waived its argument that the treatment plan was excessive because it did not specifically object to the form of the plan in its controversion notice: The notice stated only that the care was not necessary. Burke also contended that his carpal tunnel syndrome was not medically stable from May 2, 2002 through November 17, 2002, and that he should receive TTD benefits for that period of time.
Houston NANA called Burke's carpal tunnel argument a "red herring" and asserted that Burke was medically stable as of March 19, 2002. Houston NANA also argued that Burke had not met his burden of showing that his chiropractic care was reasonable and necessary, especially in light of the treatment standards set out in board regulations. In addition, it argued that Dr. Taatjes's treatment plans were inadequate in that they did not specify the frequency or duration of treatment.
The board issued its decision on October 3, 2003. It found that Burke was medically stable as of March 19, 2002, and was therefore not eligible for TTD benefits from March 19, 2002, until November 19, 2002, the day after he had surgery for right carpal tunnel syndrome. The board stated that, in accordance with Grove v. Alaska Construction and Erectors,[4] it did not have the authority to award medical benefits in excess of the regulatory standards because Dr. Taatjes had not filed a treatment plan that conformed to the requirements of AS 23.30.095(c).[5] The board rejected Burke's *857 argument that Houston NANA had waived its objection to the form of the treatment plan when it controverted chiropractic treatment. The board awarded payment for one chiropractor visit per month from May 2002 to November 2002 because Drs. Calzaretta and Davis thought that some chiropractic care was still indicated and one visit per month was within the regulatory standards. It denied Burke's request for reimbursement of his costs to attend the hearing, finding that his in-person testimony was not necessary for the limited issue on which he prevailed. The board also decided that only a limited fee award was appropriate and ordered Burke's attorney to submit another affidavit, segregating the time he spent working on the chiropractic care issue. Burke filed a timely appeal in the superior court, alleging numerous errors in the board's decision.
Before the board issued a decision on the TTD claim, Burke, through his attorney, wrote the Reemployment Benefits Administrator to request a reemployment eligibility evaluation. Acknowledging that the request was late, Burke set out "unusual and extenuating circumstances" to justify his tardy application. The unusual and extenuating circumstances were that (1) Burke suffered a series of injuries, not just a single injury, in his employment; (2) time loss benefits did not begin until November 19, 2001, more than thirty days after the last injury; (3) Burke thought he would be able to return to his work as a pipe fitter; and (4) no doctor had predicted within the first ninety days that Burke would not be able to return to his job at the time of injury. Burke also urged the RBA to reject any argument that the request for an eligibility evaluation was untimely under the board's discovery rule because, according to Burke, the plain meaning of the statute only required the RBA to make a determination of unusual and extenuating circumstances excusing a late-filed request. In response to Burke's request, Houston NANA wrote the RBA, arguing that Burke's request should be denied. On November 12, 2003, the RBA explained his interpretation of the statutory deadlines, determined that Burke had unusual and extenuating circumstances that justified his late request, and decided that Burke was entitled to an evaluation for reemployment benefits. The RBA noted that in the first ninety days after giving his employer notice of his injury, "there was no indication that rehabilitation might be needed." Houston NANA appealed the RBA's decision to the board. The board held a hearing on the reemployment benefits issue on March 10, 2004.
In its April 14, 2004 decision on the reemployment question, the board decided that the RBA had abused his discretion in finding that Burke was entitled to an eligibility evaluation. The board declared that it had a long history of applying a discovery rule in considering the statutory ninety-day deadline for applying for a reemployment eligibility evaluation. Under the board's discovery rule, the employee has ninety days from the date he has knowledge of his need for retraining to apply for an eligibility evaluation. The board determined that Burke had notice that he would need retraining at the latest on February 25, 2003, the date of Dr. Bloom's SIME report. Because Burke's request was made in September, it was deemed untimely; the board therefore reversed the RBA's decision and denied and dismissed Burke's request for an eligibility evaluation. The board did not review the RBA's determination that Burke had unusual and extenuating circumstances excusing his late-filed request, nor did it make any findings related to unusual and extenuating circumstances.
Rather than file a second appeal, Burke asked the superior court to amend his points on appeal to include the issues raised in the board's reemployment benefits decision. The court did so after receiving no opposition *858 from Houston NANA. The superior court affirmed the board's decision in all respects, except for its award of attorney's fees; the court remanded the case to the board for a redetermination of the fee award. The parties subsequently settled the fee issue, and the board approved the settlement. Burke then moved the superior court for entry of a final judgment; this appeal followed.

III. STANDARD OF REVIEW
In an appeal of a decision of a superior court acting as an intermediate court of appeal in a workers' compensation case we independently review the board's decision.[6] Factual findings are reviewed to see if they are supported by substantial evidence.[7] "Substantial evidence is `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[8] For legal questions involving agency expertise or fundamental policy questions, we apply the reasonable basis standard and defer to the agency if its interpretation is reasonable.[9] For legal questions involving no agency expertise, we substitute our judgment and apply the rule of law that is most persuasive in light of precedent, reason, and policy.[10] We review an agency's application of its regulation to the facts to determine whether the agency's decision was arbitrary, unreasonable, or an abuse of discretion.[11] We will find an abuse of discretion when we are left with the definite and firm conviction that a mistake has been made.[12]

IV. DISCUSSION

A. Burke Is Not Entitled to Chiropractic Care that Exceeds the Regulatory Standards.
Burke argues that the board erred when it ordered Houston NANA to pay for only limited chiropractic treatment. He asserts that (1) Dr. Taatjes filed a treatment plan; (2) the chiropractic care he received was reasonable and necessary; and (3) Houston NANA was barred by estoppel or waiver from arguing that the treatment plan was in any way deficient. Houston NANA responds that the board is legally precluded from awarding benefits in excess of the regulatory treatment standards unless certain conditions are met, and, because Dr. Taatjes did not meet the conditions, it cannot be made to pay for the treatments. Specifically, Houston NANA asserts that Dr. Taatjes was required to file a treatment plan that conformed with the requirements of AS 23.30.095(c) within fourteen days of the beginning of his treatment of Burke; because his treatment plan did not conform to the statutory requirements, Houston NANA cannot be made to pay for treatments in excess of the regulatory standards. It also argues that the frequency standards are not a defense or statutory right that may be waived by an employer.
Alaska Statute 23.30.095(c) contains two provisions detailing the information a health care provider must supply in order to receive payment for continuing and multiple treatments of a similar nature. First, the health care provider or the employee must provide notice of injury and treatment to the board and the employer within fourteen days of commencement of the treatment.[13] Next, if a claim is made for a course of continuing and multiple treatments that exceeds the standard treatment frequency, the health care provider is required to give a more detailed treatment plan to both the employer and the employee.[14] The treatment plan "must include objectives, modalities, frequency *859 of treatments, and reasons for the frequency of treatments."[15] The statute further specifies that, in the event a treatment plan is not furnished, neither the employer nor the employee can be made to pay for treatments that exceed the frequency standards.[16] Finally, the statute requires the board to adopt regulations establishing standards for frequency of treatment.[17]
The board has adopted a regulation establishing frequency standards that apply to all continuing treatments.[18] This regulation provides, in part:
(f) If an injury occurs on or after July 1, 1988, and requires continuing and multiple treatments of a similar nature, the standards for payment for frequency of outpatient treatment for the injury will be as follows. Except as provided in (h) of this section, payment for a course of treatment for the injury may not exceed more than three treatments per week for the first month, two treatments per week for the second and third months, one treatment per week for the fourth and fifth months, and one treatment per month for the sixth through twelfth months. Upon request, and in accordance with AS 23.30.095(c), the board will, in its discretion, approve payment for more frequent treatments.
(g) The board will, in its discretion, require the employer to pay for treatments that exceed the frequency standards in (f) of this section only if the board finds that
(1) the written treatment plan was given to the employer and employee within 14 days after treatments began;
(2) the treatments improved or are likely to improve the employee's conditions; and
(3) a preponderance of the medical evidence supports a conclusion that the board's frequency standards are unreasonable considering the nature of the employee's injury.[19]

1. Dr. Taatjes failed to file an adequate treatment plan.
The parties do not dispute that Dr. Taatjes's chiropractic treatments were in excess of the regulatory standards and that he filed some type of treatment plan. The board refused to order Houston NANA to pay for the excess treatments because Dr. Taatjes did not file a treatment plan pursuant to AS 23.30.095. Burke claims that Dr. Taatjes filed a treatment plan that substantially complied with the requirements of AS 23.30.095(c), but he does not elaborate how the forms that Dr. Taatjes filed complied with the statute.
We agree with Houston NANA that Dr. Taatjes's filings do not meet the requirements of AS 23.30.095(c). Dr. Taatjes filed a California workers' compensation form within fourteen days of beginning his treatment of Burke; this form appears to meet the first requirement of AS 23.30.095(c), that the health care provider furnish notice to the board and employer that he will be providing medical care or treatment requiring continuing and multiple treatments of a similar nature. But because Dr. Taatjes treated Burke on a more frequent basis than permitted under the applicable regulation, Dr. Taatjes was additionally required to provide a treatment plan to both Burke and Houston NANA that included "objectives, modalities, frequency of treatments, and reasons for the frequency of treatments."[20] Dr. Taatjes failed to do this.
Dr. Taatjes's first filing did not suggest that Dr. Taatjes would be treating Burke more frequently than the regulatory standards: It stated that treatment would consist of thirty visits over a twelve- to sixteen-week period. The initial notice described the modalities of treatment but not the objectives. After the initial notice, Dr. Taatjes filed periodic progress reports on forms from the California Division of Workers' Compensation. Had he supplied all of the information *860 requested on the forms, they might have contained sufficient information to be considered conforming: The forms ask the provider to specify the methods, frequency, and duration of planned treatments.[21] But Dr. Taatjes did not supply all of the requested information; specifically, he did not set out the frequency or duration of the planned treatments. The most he said about frequency of treatment was "decreasing frequency as the patient's status improves." Although Burke presented testimony that Dr. Taatjes was not aware of the requirement that he supply a detailed treatment plan, the legislature placed the burden on a health care provider to provide adequate information if he is to be reimbursed for treatments in excess of regulatory standards.[22]
Burke implicitly argues that it would be inequitable to require Dr. Taatjes to conform to Alaska's statutory requirements because he had no way of knowing that Alaska had limits on the number of treatments. This argument is unavailing, however, because Dr. Taatjes had avenues available to him to comply with the statutory requirements. Although Dr. Taatjes practices in California, the record reflects that his office contacted the Alaska Workers' Compensation Board at one point about the possibility of a lien. In addition, his office apparently discussed possible differences between Alaska and California law with the compensation carrier. Furthermore, Dr. Taatjes could simply have completed the California progress reports completely and accurately.
Burke argues that the record does not contain substantial evidence to support the board's finding that there was no dispute about whether a conforming treatment plan was provided, because he disputed the adequacy of the treatment plan. Burke has never articulated how Dr. Taatjes's filings conformed to or even substantially complied with the statutory requirements for a treatment plan. Before the board, he only argued that Houston NANA was estopped from claiming that the treatment plan was nonconforming because it had not raised that issue in its notice of controversion. Substantial evidence thus supports the board's conclusion that it was undisputed that Houston NANA did not receive a conforming plan within fourteen days of treatment.

2. Houston NANA is not estopped from raising the adequacy of the treatment plan.
Burke also argues that Houston NANA should be estopped from raising the issue of the noncompliance of Dr. Taatjes's treatment plan because it did not explicitly do so in its notice of controversion. He contends that if Houston NANA had told Dr. Taatjes of the deficiencies in the plan, Dr. Taatjes could have "stopped or modified his treatments" or "changed his treatment plan to `conform' to NANA's perceived requirements." Houston NANA responds that failure to follow the statutory requirements for the treatment plan cannot be waived, citing Grove v. Alaska Construction and Erectors.[23]
The board relied on Grove to deny Burke's claim for chiropractic treatment in excess of the frequency standards. It found that the frequency standards in the regulation could not be waived unless the treatment plan complied with the terms of AS 23.30.095(c), stating that, "[a]s in Grove, it has not been disputed that the employer was not provided with a treatment plan pursuant to AS 23.30.095 within fourteen days of the treatment."
Burke's argument is similar to the one we rejected in Grove. There, we explicitly rejected the notion that the employer has the burden of objecting to the frequency of an employee's medical treatments.[24] Rather, we determined that the legislature placed the burden on the health care provider to provide *861 a conforming treatment plan if the provider wanted to be paid for visits in excess of the treatment standards.[25] We have also held that because the requirement is statutory, the board cannot waive the prerequisite that a treatment plan be furnished within fourteen days of commencement of treatment.[26]
Although Burke argues that the board had express power to award treatment that exceeded the frequency standards, the board's power is limited to situations in which the statutory requirements of filing a conforming treatment plan are met. To accept Burke's argument that Houston NANA had the duty to tell Dr. Taatjes that the treatment plans did not conform to the statute would place the burden on the employer to object to the frequency of an employee's medical treatments; we explicitly rejected this construction of the statute in Grove.[27] Although Dr. Taatjes may have filed some sort of plan, it was not a plan that met the requirements of the statute. Because the statute requires a conforming plan, filing a nonconforming plan does not satisfy the statute.[28]

3. Rebutting the presumption of compensability
Burke also argues that he is entitled to excess chiropractic care because Houston NANA did not rebut the presumption of compensability. As Burke correctly notes, the presumption of compensability applies to every element of a factual determination.[29] He does not, however, explain how the presumption analysis interacts with the frequency standards.
The presumption analysis does not apply to every possible issue in a workers' compensation case. We have previously held the presumption of compensability inapplicable when evaluating a reemployment plan because the parties agreed that the employee's claim was covered by the provisions of the workers' compensation statute and applying the presumption did not "promote the goals of encouraging coverage and prompt benefit payment."[30]
Here, the board did not use the presumption analysis in evaluating Burke's chiropractic care claim. The presumption analysis might apply to the question whether any chiropractic care was necessary because that would raise the issue whether part of the claim was covered at all. It could also apply if a conforming treatment plan had been filed because the regulation related to excess treatment requires a factual determination about the efficacy of the treatment.[31] But we cannot see how the presumption analysis can be used to defeat the explicit statutory provision about frequency of treatment.
Even if the presumption analysis applied, Houston NANA rebutted the presumption of compensability with Dr. Willat's report, which stated that as of March 19, 2002, Burke no longer benefitted from passive chiropractic care of the type he was receiving from Dr. Taatjes. It was then incumbent on Burke to prove that further treatment was reasonable and necessary and that he was entitled to treatment in excess of the frequency standards. The board decided that *862 Burke had shown that further chiropractic care was reasonable and necessary, but it limited the frequency of care to the number of visits authorized by regulation because Dr. Taatjes had not filed a treatment plan that conformed to the requirements of AS 23.30.095(c). The board's decision with respect to chiropractic care was correct in all respects.

B. Substantial Evidence Does Not Support the Board's Denial of TTD Benefits from March 19, 2002 Through November 19, 2002.
Burke contends that he is entitled to TTD benefits from March 19, 2002, through November 18, 2002 because his carpal tunnel syndrome was not medically stable as of March 19, 2002, the date that the board determined he had reached medical stability. He alleges that substantial evidence does not support the board's finding of medical stability because evidence in the record shows that Burke was in fact being treated for his carpal tunnel syndrome prior to his carpal tunnel release surgery. In addition, Burke points out that his case is similar to Thoeni v. Consumer Electronic Services[32] in that by the time the board issued its decision, it knew that the predictive opinions on which it relied to find him medically stable were wrong.[33] Houston NANA maintains that substantial evidence in the record supports the board's decision. It points out that both IME physicians stated that Burke was medically stable as of March 19, 2002, and that one of the SIME physicians shared that opinion. It also argues that until the time of surgery, Burke was not being actively treated for carpal tunnel syndrome and that in any event, he was not disabled because of the carpal tunnel syndrome.
In analyzing Burke's claim for TTD, the board found that Burke was entitled to the presumption of compensability that he was still temporarily totally disabled by virtue of his testimony and that of Drs. Davis and Corkill. It then found that Houston NANA had rebutted the presumption through the opinions of Drs. Calzaretta, Willat, and Ramsey that Burke was medically stable as of March 19, 2002.
The board then decided that Burke had not proven his claim. It rejected his argument that his carpal tunnel syndrome was not stable and was disabling from March 19 until his surgery. Its decision was based on two findings: (1) prior to the carpal tunnel surgery, "no treatment was being recommended for the right wrist," and (2) there was "insufficient evidence that the employee was precluded from working . . . due to the condition of his wrist." The board also stated that "the medical evidence in the record regarding the employee's wrist indicated that the symptoms were subsiding and that future treatment would only be appropriate if the wrist deteriorated." The board determined that Burke was medically stable as of March 19, 2002, based on the opinions of Drs. Calzaretta, Willat, Ramsey, and Bloom and concluded that Houston NANA had overpaid TTD benefits from March 19, 2002, through May 1, 2002.
Because Burke had been receiving TTD benefits, his disability presumptively continued, and Houston NANA had the burden of producing substantial evidence that Burke was no longer disabled.[34] We held in Thoeni that a prediction of medical stability that turns out to be incorrect cannot provide substantial evidence to rebut the presumption.[35] In Burke's case, as in Thoeni, the board's determination of medical stability was based on opinions that proved to be incorrect. When the board made its decision in Burke's case, it knew that he had in fact undergone the testing and treatment that Houston NANA's expert recommended for treatment of his carpal tunnel syndrome. Houston NANA never controverted this treatment and did not contend that it was unreasonable *863 or medically unnecessary.[36] Because of this, the opinions of Drs. Ramsey and Willat could not constitute substantial evidence on which the board could rely to find that Burke was medically stable.
The board also relied on the opinions of Drs. Bloom and Calzaretta in its decision. Dr. Bloom expressly stated that, in his opinion, Burke was medically stable as of December 2002. Although Dr. Bloom also said that Burke did not derive any benefit from chiropractic care after March 19, 2002, Burke's chiropractic care was unrelated to his carpal tunnel syndrome. The section of Dr. Calzaretta's report about medical stability deals only with Burke's spinal complaints, not his carpal tunnel syndrome, and does not constitute substantial evidence to rebut the presumption that Burke's wrist was not medically stable. Dr. Calzaretta describes Burke's carpal tunnel syndrome as "resolving," in contrast to his spinal injuries, which he describes as "maximally improved."
We also hold that Houston NANA did not present substantial evidence to rebut the presumption that Burke was unable to work.[37] The only evidence before the board that might have suggested that Burke could work were the opinions of Drs. Ramsey and Calzaretta. But both doctors placed restrictions on Burke's work activities, and the restrictions were directly related to his carpal tunnel syndrome.[38] Also, carpal tunnel complaints, along with neck problems, prompted Burke to seek medical attention in Fairbanks in 2001 and caused Dr. Ramsey to give Burke a permanent partial impairment rating. Houston NANA presented no evidence that Burke was able to "earn the wages which the employee was receiving at the time of injury in the same or any other employment."[39] Because Houston NANA failed to present substantial evidence to rebut the presumption that Burke continued to be disabled, the board erred in denying his request for TTD benefits.

C. The Board Abused Its Discretion in Denying Burke's Travel Costs.
Burke argues that the board abused its discretion in failing to award him his costs for traveling to Anchorage to attend his workers' compensation hearing in person. He asserts that because the board alone determines witness credibility, in-person testimony can be critical to a claimant's case and claims that there is no way to know in advance of a hearing whether the board will consider the presence of an applicant necessary. He points out the risks that a claimant takes in not appearing in person, such as production of surreptitiously recorded videos. Houston NANA responds that the issues in this case were narrow and related to medical testimony, so Burke should have known before the hearing that his credibility was not an issue.
The board can award "the necessary and reasonable costs relating to the preparation and presentation of the issues upon which the applicant prevailed at the hearing on the claim."[40] Included in the costs that the board can award are reasonable travel costs to attend a hearing "if the board finds that the applicant's attendance is necessary."[41] We agree with Burke that it is difficult for a claimant to know in advance whether his credibility will be at issue and his presence at the hearing necessary. Houston NANA contends that the issues in this case were only related to medical testimony, but the issues *864 the board faced went beyond expert testimony. The board made findings about Burke's ability to continue his work as a pipe fitter, which related to the issue of temporary disability and presumably required testimony from Burke about his work duties and limitations. In addition, had the board determined that Dr. Taatjes had filed an adequate treatment plan, it could have considered Burke's testimony about the efficacy of chiropractic care in deciding whether treatments in excess of the regulatory standards were justified.[42] Also, Burke has now prevailed on his temporary disability claim and therefore is eligible for the award of necessary and reasonable costs.[43] For these reasons, the board abused its discretion in failing to award Burke his travel costs to attend the hearing in person.

D. The Board Erred in Reversing the Reemployment Benefit Administrator's Decision.
Burke also appeals the board's second decision, in which the board reversed the determination of the Reemployment Benefit Administrator that Burke was entitled to a reemployment eligibility evaluation. Burke maintains that the plain meaning of 8 AAC 45.520 and former AS 23.30.041(c)[44] entitle him to an evaluation and that the board's imposition of a discovery rule[45] is invalid. He also contends that the board failed in its duty to advise him how to pursue his rights and denied him due process and equal protection.
Houston NANA responds that the discovery rule is a reasonable interpretation of the workers' compensation statute because it furthers the statute's purpose of providing fair and prompt resolution of compensation cases. It asserts that substantial evidence supports the board's determination that Burke knew or should have known that he would not be able to return to his work as a pipe fitter by February 25, 2003, and argues that no unusual or extenuating circumstances existed under the regulation to excuse Burke's subsequent late filing.
The main issue Burke raises is the application of the following statute and regulation to his case. Former AS 23.30.041(c) provided:
If an employee suffers a compensable injury that may permanently preclude an employee's return to the employee's occupation at the time of injury, the employee or employer may request an eligibility evaluation for reemployment benefits. The employee shall request an eligibility evaluation within 90 days after the employee gives the employer notice of injury unless the administrator determines that the employee has an unusual and extenuating circumstance that prevents the employee from making a timely request.[[46]]
*865 The board adopted a regulation, which became effective July 2, 1998, interpreting "unusual and extenuating circumstance."[47] The regulation provides:
(a) An employee requesting an eligibility evaluation for reemployment benefits more than 90 days after giving the employer notice of the injury must submit to the administrator
(1) a written request for the evaluation;
(2) a doctor's prediction that the injury may permanently preclude the employee from returning to the job at the time of injury; and
(3) a written statement explaining the unusual and extenuating circumstances that prevented the employee from timely requesting the eligibility evaluation.
(b) Within 30 days after receiving the information required under (a) of this section, the administrator will notify the parties, by certified mail, whether the employee had an unusual and extenuating circumstance that prevented the employee from making a timely request for an eligibility evaluation. An unusual and extenuating circumstance exists only if the administrator determines that within the first 90 days after the employee gave the employer notice of the injury
(1) a doctor failed to predict that the employee may be permanently precluded from returning to the job at the time of injury;
(2) the employee did not know that a doctor predicted the employee may be permanently precluded from returning to the job at the time of injury;
(3) the employer accommodated the employee's limitation and continued to employ the employee;
(4) the employee continued to be employed;
(5) the compensability of the injury was controverted and compensability was not resolved; or
(6) the employee's injury was so severe that the employee was physically or mentally prevented from requesting an eligibility evaluation.
(c) Within 10 days after the decision, either party may seek a review of the decision by requesting a hearing under AS 23.30.110.[[48]]
The board adopted a regulation detailing how an employee should request a reemployment eligibility evaluation at the same time it promulgated the regulation defining unusual and extenuating circumstances.[49] This regulation, 8 Alaska Administrative Code 45.510, provides in relevant part:
(a) For injuries occurring on or after July 1, 1988, an employee or an employer may request an eligibility evaluation for reemployment benefits. The request must be in writing, complete in accordance with (b) of this section, and submitted to the administrator.
(b) The administrator will consider a written request for an eligibility evaluation for reemployment benefits if the compensability of the injury has not been controverted and if the request is submitted together with
(1) an explanation of the unusual and extenuating circumstances, as defined in 8 AAC 45.520, for a request that is made more than 90 days after the date the employee gave the employer notice of the injury; and
(2) a physician's prediction that the injury may permanently preclude the employee from returning to the job at time of injury.[[50]]
Burke did everything that was required by the new regulations. His request for an eligibility evaluation was submitted more than ninety days after he gave notice of his *866 injury. Accordingly, he submitted a written request for an evaluation, a doctor's prediction that his work-related injury would permanently preclude him from returning to his work as a pipe fitter, and a statement explaining the unusual and extenuating circumstances that prevented him from making a timely request for an eligibility evaluation. No one argues that by January 28, 2002 ninety days after Burke signed the notice of injury  a doctor had predicted that Burke would be unable to return to his job at the time of injury. Indeed, Dr. Taatjes predicted on March 15, 2002, that Burke would "be released to working status" by April 15, 2002. But instead of following its regulations, the board looked back to a prior period to find a rule that barred Burke's request.
Before the two new regulations took effect in 1998, the board had developed through adjudication a discovery rule to be used in considering reemployment eligibility evaluation requests.[51] Under the board's discovery rule, an employee who failed to request a reemployment eligibility evaluation within ninety days of providing notice of the injury to the employer as required by former AS 23.30.041(c) was required to request the evaluation within ninety days of the date the employee knew or should have known that he might not be able to return to the occupation at the time of injury.[52] This case presents two questions: (1) whether the regulations adopted in 1998, which did not explicitly contain a discovery rule, should be read as continuing the rule despite their silence, and, if not, (2) whether, following the adoption of the regulations, the board had the power to impose a discovery rule by adjudication and thereby hold that Burke's request was untimely. We conclude that the answer in both instances is no.

1. Whether the 1998 regulations, which did not explicitly contain a discovery rule, should be read as continuing the rule despite their silence
When the board promulgated its regulations interpreting former AS 23.30.041(c), it codified its prior decisions about what constituted an unusual and extenuating circumstance.[53]Neither regulation mentions the discovery rule.[54] The conflict between the previously-imposed discovery rule and the proposed regulation interpreting "unusual and extenuating circumstances" was brought up in public comments about the regulation: A public commenter, a workers' compensation attorney, filed a comment noting that the proposed regulation was a departure from board case law imposing a discovery rule and raised the concern that the regulation would "leave open the amount of time an injured employee may request reemployment benefits."[55] The board did not change the text of the regulation in response to the comment.[56] From this there is at least a suggestion that the board declined to continue, by means of its rulemaking authority, the discovery rule it had previously adopted through adjudication. The board's consideration of the discovery rule at the time it promulgated the regulations further persuades us that the board must use rulemaking rather than adjudication to effectuate the requirements that an employee must meet in order to request a reemployment eligibility evaluation under former AS 23.30.041(c).[57]

*867 2. Whether the board had the power, in the face of its decision to adopt new regulations that did not include a discovery rule, to impose a discovery rule by adjudication
Burke asserts that the board cannot by adjudication "add requirements to the law that neither the legislature nor the executive branch in its rule-making power chose to add to the Act or regulations, respectively." We agree: If the board wished to add to the deadlines it explicitly set in the regulations  via adoption of a discovery rule  it was required to do so by regulation.[58]
We have previously held that an administrative agency can set and interpret policy using adjudication instead of rulemaking, absent statutory restrictions and due process limitations,[59] and noted that the board has broad powers to administer the Alaska Workers' Compensation Act, including the authority to interpret statutes.[60] But the board's power is not unlimited. Alaska law requires an agency to follow certain procedures, including public notice and an opportunity for public comment, before it can supplement or amend a regulation.[61] Alaska Statute 44.62.640(a)(3) defines "regulation" to include "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by [the agency]." (Emphasis added.)
Whether an agency action is a regulation is a question of law that does not involve agency expertise, so we apply our independent judgment.[62] We have previously addressed the issue whether an agency action is an interpretation or an amendment of a regulation.[63] In making this determination, we have looked at a variety of factors. We have compared the agency action with the statutory indicia of a regulation, including whether the action "implements, interprets or makes specific the law enforced or administered by the state agency" and "affects the public or is used by the agency in dealing with the public."[64] Noting that many agency actions that are not regulations can affect the public, we have looked at the distinction drawn by the Court of Appeals for the District of Columbia between internal agency practices, which do not require notice and comment rulemaking, and regulations, which do. That court identified the "critical feature" of an internal agency practice as "agency actions that do not themselves alter the rights or interests of the parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency."[65] Finally, we have *868 looked to see if the agency action provides new requirements or makes the existing requirements more specific.[66]
Using these standards, we conclude that the board's discovery rule is a regulation that amends or supplements 8 AAC 45.510 and 45.520. The discovery rule, according to the board, implements, interprets, and makes more specific former AS 23.30.041(c),[67] and it clearly affects the public  without the discovery rule, Burke's reemployment eligibility evaluation request would have been accepted. The discovery rule is also the type of agency action that alters the rights of the parties: It works to modify the requirements employees must meet in order to qualify for an eligibility evaluation under former AS 23.30.041(c). Finally, it changes the requirements for a reemployment eligibility evaluation request from those set out in the regulations: With the discovery rule, an employee who is requesting an evaluation more than ninety days after notice of injury may no longer satisfy the statutory requirements by submitting a written request to the Reemployment Benefit Administrator that is "complete in accordance with [8 AAC 45.510(b)]."[68]
The dissent argues that it was reasonable for the board to interpret its regulation as creating a new ninety-day period to request reemployment benefits and that it would be unreasonable to interpret the regulation to allow an unlimited time to file a request once an extenuating circumstance ended.[69] As to the first point, it is true that the board could have adopted a regulation to provide for a new ninety-day period, but it did not do so. This is critical, because there is no doubt that the interpretation given by the board here  enforcement of a discovery rule  "interprets and makes more specific" the former statute and it does so in a way that alters the rights of the parties. In these circumstances, an agency must act through rule-making, not adjudication.[70] As to the dissent's second argument  that it would be unreasonable to interpret the regulation as allowing an unlimited time to file a request  the legislature in the former statute set no limit upon requests once unusual and extenuating circumstances were shown; rather, it gave broad discretion to the Reemployment Benefit Administrator to consider the circumstances justifying a late application.[71] Here, the delay was about three months, certainly not an unreasonable amount of time given the length of time  about sixteen months  that passed before it had become evident that Burke would not be able to return to his former occupation.
The dissent concludes that the board's determination that the new regulation contained a discovery rule was "readily predictable." But that conclusion ignores that the workers' compensation attorney commenting to the board[72] and the Reemployment Benefits Administrator[73] both came to the opposite conclusion. And even if one had divined that the board might ignore the legal requirement that it act through rule-making, not adjudication, when it interprets and makes more specific a regulation in a way that alters the rights of a party, such prescience would not justify the board's action.
Because the board chose to establish by regulation the procedure an applicant for a reemployment eligibility evaluation must use, it is bound by those regulations unless and until it repeals or amends the regulation using the proper procedure.[74] Administrative *869 agencies are bound by their regulations just as the public is bound by them.[75] If the board wished to apply a discovery rule to requests that were made after the ninety-day period defined in the statute but which also met the statutory excuse of unusual and extenuating circumstances  as Burke's request did in this case  it was obligated to promulgate such a rule under Alaska law. We hold that the discovery rule imposed in this case is invalid because the board did not adopt it as a regulation under AS 44.62.010-.950. We therefore reverse the board's decision that reversed the Reemployment Benefit Administrator's determination finding Burke eligible for a reemployment eligibility evaluation.[76]

V. CONCLUSION
Because substantial evidence does not support the board's conclusion that Burke was not entitled to TTD benefits from March 19 to November 19, 2002, we REVERSE the board's decision denying him TTD benefits for that period of time. We also REVERSE the board's refusal to order reimbursement for Burke's travel to attend the hearing and its reversal of the Reemployment Benefit Administrator's decision. We AFFIRM the board's decision in all other respects.
BRYNER, Justice, not participating.
MATTHEWS, Justice, dissenting in part.

Introduction
Today's opinion holds that the board erred when it decided that the ninety-day period to request an eligibility evaluation for reemployment benefits starts when an employee knows or should know that his injury may permanently prevent him from returning to his job.[1] The court reasons that to reach this conclusion the board would have had to promulgate a regulation under the Administrative Procedure Act (APA) and could not do so by interpreting the applicable statute and regulations. I disagree.
The board concluded that AS 23.30.041(c) required Burke to request an evaluation within ninety days after the point at which he reasonably should have known that he needed retraining. Since Burke knew by February 25, 2003, that he could not return to his job, and did not request an evaluation until September 11, 2003, 198 days later, the board held that Burke's request was untimely. The board's conclusion that the statutory ninety-day deadline began to run anew when Burke knew or should have known that he needed retraining was consistent with prior board rulings that "knowledge of the need for reemployment benefits re-triggers the running of the 90 day period to request these benefits." The board noted that its ruling was necessary in order to give meaning to the statute in accordance with the purpose of the legislature. It observed that under the reemployment benefit administrator's (RBA) conflicting interpretation, "an employee could request reemployment benefits years, or decades, after being advised of the need for retraining."
In my view the board's ruling was correct. Nothing in the regulations concerning subsection.041(c) undercut the validity of the board's prior rulings. Burke did not rely upon the APA  which requires agencies to act by promulgating regulations in certain circumstances. Further, the APA did not prohibit the board from ruling as it did.

*870 The Discovery Rule
The court's discussion is, for me at least, hard to follow. One problem lies with the court's use of the term "discovery rule." A discovery rule is a rule relieving a claimant from compliance with a statutory limitations period where the claimant reasonably lacks the opportunity to have "discovered" sufficient information to file a claim.[2] Once the claimant discovers or should have discovered sufficient information about the claim, the whole period of limitations is retriggered and begins to run anew.[3] Thus the discovery rule in Alaska has two parts. What might be called Part A grants relief from a statutory limitations period, while what might be called Part B retriggers the limitations period. Both parts are rules of statutory interpretation. We assume that the legislature would not wish to impose a deadline on a claimant before the claimant has "discovered" his claim. We also assume that once such a "discovery" has been made the legislature would want the statutory deadline to begin to run.[4] Confusingly, the court (except in footnote 45) uses the term "discovery rule" only to refer to Part B, the retriggering aspect of the discovery rule.[5] It also does not seem to recognize that the discovery rule is a rule of presumed legislative intent designed to balance two competing policies: "the basic fairness of insuring a plaintiff's right to seek relief," and the interests that underlie limitations periods.[6]

The Board's Retriggering Ruling Followed Established Law
Under AS 23.30.041(c) employees had ninety days to apply for an eligibility evaluation unless extenuating circumstances prevented a timely submission.[7] The extenuating circumstances provision was a type of discovery rule granting relief from the limitations period  thus encompassing what I have called Part A of the discovery rule. But subsection.041(c), like other statutes of limitations, said nothing about retriggering the statutory period. In other words, no Part B was expressed.
The regulations defined "extenuating circumstances" to include cases where the worker was not told by his physician that he would not be able to return to his job within the ninety-day period.[8] Here, the worker met this extenuating circumstance: he was not told of his inability to return to work within the ninety-day period. Rather, he was told nearly sixteen months after the event. But he did not apply for retraining until more than ninety days after that. Was his application time-barred? To answer this question one must interpret the statute and the regulations. Did the statute and regulations mean that when the worker received notice and the extenuating circumstance terminated the worker had a new ninety-day period in which to apply? Or did they mean that the worker had an indefinite period in which to apply? Both the statute and the regulations were silent on this issue.
*871 The board decided that there was a new ninety-day period. This interpretation was readily predictable. Decisions of this court have uniformly applied what I have called Part B of the discovery rule: when conditions excusing late filing of a claim no longer exist, a new deadline for filing is imposed that is equal in duration to the legislatively set deadline.[9] Prior decisions of the board, decided both before and after the regulations became effective, had recognized and applied this rule to .041(c)'s ninety-day deadline.[10] As the board stated, "the Board has a long, consistent history of finding that knowledge of the need for reemployment benefits re-triggers the running of the 90 day period to request these benefits."[11]
The board's ruling in this case that a new ninety-day period would begin to run when the extenuating circumstance terminated was as correct as it was predictable. The regulations are silent on the question of whether a new deadline will be imposed. In light of this silence, there was no reason to believe that the board's prior rulings would not continue to be effective. Indeed, if the regulations had explicitly stated that once extenuating circumstances ended, the worker had an unlimited time to file an application, they probably would have been invalid[12] because *872 they would not have been consistent with the statutory purpose of requiring applications within a short period of time.[13]
For me, this would be the end of the discussion. But today's opinion holds that any retriggered ninety-day deadline should be established by regulation. Because it was not, the opinion holds that the board's ruling is invalid and workers therefore had an unlimited or indefinite time to apply after extenuating circumstances terminated.[14] I view this holding with considerable skepticism because its result conflicts with the legislative intent underlying the ninety-day limit, our own case law, and the board's case law. The court bases this seemingly counter-intuitive conclusion on the APA.[15] For the following reasons, I do not think that the APA should guide our decision.

Burke Did Not Raise Any Contention Regarding the Administrative Procedure Act
Burke did not make any argument before the board, the superior court, or this court relying on, citing, or even mentioning the APA. Instead, Burke argued that because the board in promulgating the regulation did not provide for a renewed ninety-day deadline, the board "did not want" such a deadline. In today's opinion the court states: "Burke asserts that the board cannot by adjudication `add requirements to the law that neither the legislature nor the executive branch in its rule-making power chose to add to the Act or regulations, respectively.'"[16] The full sentence in Burke's brief from which this quote is taken reads: "Neither the RBA nor the board can add requirements to the law that neither the legislature nor the executive branch in its rule-making power chose to add to the Act or regulations, respectively." What Burke means by this statement is that the board could not hold that a new ninety-day period is triggered because doing so would be contrary to the intent of the legislature and the intent of the board; he does not argue that doing so would be contrary to the provisions of the APA requiring agencies to act by adopting regulations.[17]
*873 Because no argument regarding the APA's requirements was raised, the appellee has not had a fair opportunity to weigh in on the question of whether the board's ruling should be considered invalid because it should have been expressed as a regulation. As already noted, Burke also did not raise the APA contention before the board or the superior court. Therefore, this court has not received the benefit of the analysis of the parties, the board, or the superior court on this point. Under these circumstances, it seems to me that whether the APA precluded the board from adjudicatively interpreting the statute and regulations should properly play no part in this court's decision.[18]

The Administrative Procedure Act Was Not Violated
My conclusion that the APA should not be considered in this case seems especially well justified given the opacity of the question of under what circumstances the APA may require rulemaking. In Alyeska Pipeline Service Co. v. State, Department of Environmental Conservation,[19] we recognized the conflict between the broad language of the APA and the practical exigencies of agency action:
Although the definition of "regulation" is broad, it does not encompass every routine, predictable interpretation of a statute by an agency. Nearly every agency action is based, implicitly or explicitly, on an interpretation of a statute or regulation authorizing it to act. A requirement that each such interpretation be preceded by rulemaking would result in complete ossification of the regulatory state. . . . Although the Administrative Procedure Act may require rulemaking in cases in which an agency's interpretation of a statute is expansive or unforeseeable, or in cases in which an agency alters its previous interpretation of a statute, obvious, commonsense interpretations of statutes do not require rulemaking.[[20]]
Today's opinion argues that the APA applies to the board's interpretation because the board's interpretation is new: "It works to modify the requirements employees must meet in order to qualify for an eligibility evaluation under former AS 23.30.041(c)" and "it changes the requirements for a reemployment eligibility evaluation request from those set out in the regulations."[21] But the board's interpretation was neither new nor a change. This court has consistently adhered to Part B of the discovery rule, holding that statutory deadlines spring to life anew once conditions excusing initial noncompliance with them have ended.[22] There was no reason to suppose that these holdings would not apply to the ninety-day deadline in AS 23.30.041(c). The board, indeed, had always applied just such a rule to subsection.041(c).[23] Since the regulations are completely silent on the subject of the deadline to be imposed after extenuating circumstances *874 come to an end, there was no reason to think that the board's prior rulings on that subject would not apply. And if it were supposed that the regulations signaled a change from the prior interpretation of subsection .041(c), the board's rulings in the Gillen and Jerry cases which were decided under the regulations (Gillen more than three years before the board's decision in this case) would put an end to any such notion.[24]
All of the quoted factors mentioned in Alyeska Pipeline point to the conclusion that the board's decision in this case was permissibly made as an adjudication that did not require rulemaking under the APA. This case does not involve an "expansive or unforeseeable interpretation," nor is it a case in which an agency had altered "its previous interpretation of a statute."[25] Instead, the board's interpretation was in accord with its prior decisions and was therefore foreseeable.[26] Further, in light of the decisions of this court, the board, and the intent of the legislature, the board's ruling was also "an obvious, commonsense interpretation[]" of the statute and regulations.[27] Here, as in Alyeska Pipeline, I would conclude that the agency's action "do[es] not require rulemaking."[28]

Conclusion
Alaska Statute 23.30.041(c) is a statutory expression of Part A (relief from a statutory deadline) of the discovery rule. It is silent as to Part B (retriggering the deadline). Before and after the adoption of the regulations, the board interpreted the statute, in accordance with Part B of the discovery rule, to retrigger the ninety-day deadline once exigencies had passed. The regulations  which concerned relief but not retriggering  did nothing to call this interpretation into question. Burke did not contend that the APA was violated. The board's reaffirmation in this case of its longstanding interpretation of the statute did not, in any event, violate the APA because the APA does not apply to the foreseeable, common sense rulings of an agency.
For these reasons, I would affirm the board's ruling. On the other issues presented by this case, I agree with the court's opinion.
NOTES
[1] We refer to Houston NANA, L.L.C. and its insurer, Lumberman's Mutual Casualty Co., collectively as "Houston NANA."
[2] Burke testified that he filed a report with the safety department so that a similar accident did not happen to another worker; he called it "a near miss form."
[3] Epicondylitis is the inflammation of the epicondyle or the tissues adjoining the epicondyle of the humerus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 564 (28th ed.1994). An epicondyle is a prominence or projection above the rounded projection of the bone. Id. at 367, 544, 564. The humerus is the bone that extends from the shoulder to the elbow. Id. at 779. Tennis elbow is a type of epicondylitis. Id. at 564.
[4] 948 P.2d 454 (Alaska 1997).
[5] AS 23.30.095(c) provides:

A claim for medical or surgical treatment, or treatment requiring continuing and multiple treatments of a similar nature is not valid and enforceable against the employer unless, within 14 days following treatment, the physician or health care provider giving the treatment or the employee receiving it furnishes to the employer and the board notice of the injury and treatment, preferably on a form prescribed by the board. . . . When a claim is made for a course of treatment requiring continuing and multiple treatments of a similar nature, in addition to the notice, the physician or health care provider shall furnish a written treatment plan if the course of treatment will require more frequent outpatient visits than the standard treatment frequency for the nature and degree of the injury and the type of treatments. The treatment plan shall be furnished to the employee and the employer within 14 days after treatment begins. The treatment plan must include objectives, modalities, frequency of treatments, and reasons for the frequency of treatments. If the treatment plan is not furnished as required under this subsection, neither the employer nor the employee may be required to pay for treatments that exceed the frequency standard. The board shall adopt regulations establishing standards for frequency of treatment.
[6] Dougan v. Aurora Elec., Inc., 50 P.3d 789, 793 (Alaska 2002).
[7] DeYonge v. NANA/Marriott, 1 P.3d 90, 94 (Alaska 2000).
[8] Id. (quoting Grove, 948 P.2d at 456).
[9] DeNuptiis v. Unocal Corp., 63 P.3d 272, 277 (Alaska 2003).
[10] Circle De Lumber Co. v. Humphrey, 130 P.3d 941, 946 (Alaska 2006).
[11] Hodges v. Alaska Constructors, Inc., 957 P.2d 957, 960 (Alaska 1998).
[12] See Dougan v. Aurora Elec., Inc., 50 P.3d 789, 793 (Alaska 2002).
[13] AS 23.30.095(c).
[14] Id.
[15] Id.
[16] Id.
[17] Id.
[18] 8 Alaska Administrative Code (AAC) 45.082 (2004).
[19] 8 AAC 45.082(f)-(g) (2004).
[20] AS 23.30.095(c).
[21] The California progress report forms do not ask about the objective of the treatments, however. AS 23.30.095(c) requires that a treatment plan contain the objectives of treatment.
[22] See AS 23.30.095(c); see also Grove v. Alaska Constr. and Erectors, 948 P.2d 454, 457 (Alaska 1997) ("The statute is clear that it is the employee's health care provider who must take steps if the statutory frequency of that treatment is exceeded.").
[23] 948 P.2d at 454.
[24] Id. at 457.
[25] Id.; see also Hale v. Anchorage Sch. Dist., 922 P.2d 268, 270 (Alaska 1996) (holding that physical therapist was required to file a conforming treatment plan within fourteen days of beginning treatment).
[26] Crawford & Co. v. Baker-Withrow, 73 P.3d 1227, 1229 (Alaska 2003) (citing Grove, 948 P.2d at 457).
[27] Grove, 948 P.2d at 457.
[28] Even if we were to evaluate Burke's estoppel claim on the merits, it would fail. Estoppel requires an assertion by word or conduct, reasonable reliance, and resulting prejudice. Tufco, Inc. v. Pac. Envtl. Corp., 113 P.3d 668, 671 (Alaska 2005). Burke has not clearly identified the assertion on which he relied, nor has he shown that he was prejudiced. AS 23.30.095(c) provides that neither the employer nor employee can be made to pay for excess treatments when the health care provider fails to file a conforming plan.
[29] See Sokolowski v. Best W. Golden Lion Hotel, 813 P.2d 286, 292 (Alaska 1991).
[30] Rockney v. Boslough Constr. Co., 115 P.3d 1240, 1244 (Alaska 2005).
[31] 8 AAC 45.082(g) (2004).
[32] 151 P.3d 1249 (Alaska 2007).
[33] Id. at 1255-56.
[34] See Grove v. Alaska Constr. and Erectors, 948 P.2d 454, 458 (Alaska 1997) ("Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary." (citing Bailey v. Litwin Corp., 713 P.2d 249, 254 (Alaska 1986))).
[35] 151 P.3d at 1256.
[36] In its notice of controversion, Houston NANA indicated that it would cover treatment for Burke's carpal tunnel syndrome "as outlined in Dr. Ramsey's EME report."
[37] It is not clear whether Houston NANA seriously contends that Burke could in fact work. Its arguments at the board hearing related only to the issue of medical stability, and its brief before this court takes inconsistent positions. At one point in the brief it claims that "there is no medical evidence that Mr. Burke was unable to work because of his mild carpal tunnel syndrome," while elsewhere in the same brief it states that "there is no dispute . . . regarding the nature or extent of Mr. Burke's disability."
[38] Dr. Calzaretta imposed an additional restriction that Burke not lift more than forty pounds overhead to prevent any further neck or back strain.
[39] AS 23.30.395(16) (defining "disability").
[40] 8 AAC 45.180(f) (2004).
[41] 8 AAC 45.180(f)(13) (2004).
[42] See 8 AAC 45.082(g)(2) (2004).
[43] See 8AAC 45.180(f) (2004).
[44] Former AS 23.30.041(c) (1988), amended by ch. 10, § 17, FSSLA 2005.
[45] The dissent criticizes this opinion's use of the term "discovery rule." But this court uses the term as the parties used it in their briefs: as shorthand for the judicial interpretation of a statute of limitations that (1) excuses a failure to act when a claimant in unaware of facts necessary to appreciate that he has a claim and then, once such appreciation is gained, (2) retriggers the running of the limitations period. Burke, in attacking the board's decision, said this in his opening brief:

The Act contains no "discovery rule." The board's own regulation contains no discovery rule. Thus, the board was wrong . . . to adopt a de facto "discovery rule" against the injured worker. The RBA was correct because Mr. Burke met the law's requirements. The legislature could have included such a discovery rule in the Act. The lack of it is evidence the legislature did not want it. . . .
Burke thus argued that the statute excused his failure to seek an evaluation within the original ninety-day period under the circumstances of his case and nowhere contained any requirement that he act within ninety days of a retriggering event.
Houston NANA, replying to Burke's argument, entitled a section of its brief, "There is a Reasonable Basis for the Board's Adoption of the Discovery Rule," and mentioned the "discovery rule" eight times over the next six pages. Houston NANA in its brief relied on the retriggering obligation of the discovery rule to support its position.
[46] This statutory scheme  putting the burden of requesting an eligibility evaluation on the worker within narrow time limits  no longer exists: The 2005 amendments to the Alaska Workers' Compensation Act require the Reemployment Benefits Administrator to order an eligibility evaluation whenever the employee is not able to return to his or her employment at the time of injury for a period of ninety consecutive days. Ch. 10, § 17, FSSLA 2005.
[47] Alaska Administrative Code, Register 146 (July 1998).
[48] 8 AAC 45.520 (2004).
[49] Alaska Administrative Code, Register 146 (July 1998).
[50] 8 AAC 45.510(a) & (b) (2004).
[51] See Harsen v. B & B Farms, AWCB Decision No. 94-0253 (Sept. 30, 1994); see also Waters v. Grace Drilling, AWCB Decision No. 95-0046 (Feb. 17, 1995). But see Bales v. State, Dep't of Natural Res., AWCB Decision No. 96-0104 at 15-16 n. 5 (Mar. 12, 1996) (questioning validity of discovery rule).
[52] Waters, AWCB Decision No. 95-0046 at 5-6 (Feb. 17, 1995); Harsen, AWCB Decision No. 94-0253 at 10 (Sept. 30, 1994).
[53] Williams v. Municipality of Anchorage, AWCB Decision No. 98-0273 at 12 (Oct. 30, 1998).
[54] See 8 AAC 45.510 and 45.520 (2004), set out supra at 865-66.
[55] Comment by Theresa Henneman to proposed 8 AAC 45.520, Department of Labor Proposed Regulations for the Alaska Workers' Compensation Board (Sept. 1997).
[56] Compare 8 AAC 45.520 and proposed 8 AAC 45.520, Department of Labor Proposed Regulations for the Alaska Workers' Compensation Board (Sept. 1997).
[57] See Patel v. INS, 638 F.2d 1199, 1204 (9th Cir.1980) (holding that agency abused its discretion in adding criterion through adjudication that it had previously considered and withdrawn during rulemaking). But see Mehta v. INS, 574 F.2d 701 (2d Cir.1978) (reaching opposite conclusion).
[58] See Jerrel v. State, Dep't of Natural Res., 999 P.2d 138, 143-44 (Alaska 2000) (holding that administrative agencies must comply with AS 44.62 when issuing regulations pursuant to delegated statutory authority); see also Alaska Ctr. for the Env't v. State, 80 P.3d 231, 243 (Alaska 2003) (holding that adoption of standard defining "major energy facility" did not amount to regulation requiring formal adoption).
[59] Amerada Hess Pipeline Corp. v. Alaska Pub. Util. Comm'n, 711 P.2d 1170, 1178 (Alaska 1986); see also 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.9 (4th ed.2002) (discussing when courts consider rulemaking necessary); 1 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE § 2.12[4] (2d ed.1997) (discussing required rulemaking).
[60] DeNuptiis v. Unocal Corp., 63 P.3d 272, 277 (Alaska 2003); see also Bloom v. Tekton, Inc., 5 P.3d 235, 238 (Alaska 2000) (noting that board had consistently interpreted the workers' compensation act to allow an employee to substitute a physician in certain circumstances).
[61] AS 44.62.190, .200-.215.
[62] Alaska Ctr. for the Env't v. State, 80 P.3d 231, 243 (Alaska 2003) (citations omitted).
[63] Id. at 243-44; see also Jerrel, 999 P.2d at 143-44; Kachemak Bay Watch, Inc. v. Noah, 935 P.2d 816, 825-26 (Alaska 1997).
[64] Jerrel, 999 P.2d at 143 (citations omitted); AS 44.62.640(a)(3).
[65] Batterton v. Marshall, 648 F.2d 694, 707 (D.C.Cir.1980) (quoted in Kachemak Bay Watch, Inc., 935 P.2d at 825). AS 44.62.640(a)(3) similarly excludes from the definition of "regulation" rules that "relate[] only to the internal management of a state agency."
[66] Alaska Ctr. for the Env't, 80 P.3d at 244.
[67] Gillen v. Glen Mills Constr., AWCB Decision No. 00-0255 at 7-9 (Dec. 12, 2000).
[68] 8 AAC 45.510(a) (2004).
[69] In fact, the board's opinion does not say that it is interpreting its regulation at all. Instead, it purports to interpret the statute, former AS 23.30.041(c), as including a discovery rule. Its decision in this case does not discuss application of the regulations to Burke's facts, nor does it explain why the regulation  which conspicuously does not contain a discovery rule  would not apply to him.
[70] Jerrel v. State, Dep't of Natural Res., 999 P.2d 138, 143 (Alaska 2000); AS 44.62.640(a)(3).
[71] Former AS 23.30.041(c).
[72] See supra text accompanying n. 55.
[73] See supra at 858.
[74] See Jerrel, 999 P.2d at 143-44; see also Tunik v. Merit Sys. Prot. Bd., 407 F.3d 1326, 1341 (Fed.Cir.2005) (concluding that regulation subject to notice and comment rulemaking cannot be overturned except through notice and comment rulemaking); Am. Fed'n of Gov't Employees, AFL-CIO, Local 3090 v. Fed. Labor Relations Auth., 777 F.2d 751, 758-60 (D.C.Cir.1985) (stating that to repeal or modify regulation, agency must do so through rulemaking rather than adjudication).
[75] Brandon v. State, Dep't of Corr., 73 P.3d 1230, 1235 (Alaska 2003); Trs. for Alaska v. Gorsuch, 835 P.2d 1239, 1244 (Alaska 1992); see United States v. Nixon, 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (noting that regulation binds Executive Branch until it is amended or revoked).
[76] Because we uphold the RBA's determination that Burke was eligible for a reemployment eligibility evaluation (on the ground that the board failed to adopt the discovery rule as regulation), it is not necessary for us to reach Burke's alternative arguments that the board failed in its duty to advise him how to pursue his rights, that it denied him due process, and that it denied him equal protection.
[1] Op. at 863-69.
[2] See, e.g., Cameron v. State, 822 P.2d 1362, 1365 (Alaska 1991) ("The discovery rule developed as a means to mitigate the harshness that can result from the . . . preclusion of claims where the injury provided insufficient notice of the cause of action to the plaintiff.").
[3] See, e.g., John's Heating Serv. v. Lamb, 129 P.3d 919, 926 (Alaska 2006); Roach v. Caudle, 954 P.2d 1039, 1041 (Alaska 1998); Cameron, 822 P.2d at 1365-67; Greater Area Inc. v. Bookman, 657 P.2d 828, 829 (Alaska 1982).
[4] See Cameron, 822 P.2d at 1365 n. 5 and accompanying text.
[5] See Op. at 863-64, 864, 866, 867, 868, 868-69, and 869.
[6] Cameron, 822 P.2d at 1365.
[7] Former AS 23.30.041(c) provided:

If an employee suffers a compensable injury that may permanently preclude an employee's return to the employee's occupation at the time of injury, the employee or employer may request an eligibility evaluation for reemployment benefits. The employee shall request an eligibility evaluation within 90 days after the employee gives the employer notice of injury unless the administrator determines the employee has an unusual and extenuating circumstance that prevents the employee from making a timely request. The administrator shall, on a rotating and geographic basis, select a rehabilitation specialist from the list maintained under (b)(6) of this section to perform the eligibility evaluation.
[8] Former 8 AAC 45.520. See Op. at 864-65.
[9] See supra note 3.
[10] See Jerry v. Chandler Corp., 2004 WL 305352; Gillen v. Glen Mills Constr., 2000 WL 1862603; Stark v. Stark-Lewis Co., 1998 WL 771054; Waters v. Grace Drilling, 1995 WL 143757; Harsen v. B & B Farms, 1994 WL 773328.

Stark, supra, is a good example of a board ruling interpreting subsection .041(c) before the regulations were effective. In Stark, the notice of injury was given on September 24, 1996, but the employee did not request an evaluation until August 12, 1997. Reversing a contrary determination of the RBA, the board found that until June 3, 1997, the employee had no reason to believe he could not return to his usual work. Since the employee's request was made within ninety days of this date, it was held to be timely. The board noted, in accordance with its prior decisions, that "the 90-day period for requesting an eligibility evaluation begins to run when the employee knew or should have known that he might not be able to return to the work he was doing at the time of injury." Id. at *5.
Not long after the regulations in question were adopted, the RBA concluded, just as the RBA did in the present case, that in light of the new regulations "there is no new 90-day limit imposed after an employee is informed by a physician that he may be permanently precluded from returning to work at the time of the injury." Gillen, supra, at *2. The board reversed this legal conclusion, in keeping with its pre-regulation decisions that the "90-day time period under AS 23.30.041(c) begins to run when the employee knew, or should have known, the injury may permanently preclude him from returning to his occupation at the time of injury." Id. at *5.
Jerry, supra, is another post-regulation case. In Jerry the notice of injury seems to have been given shortly after the injury itself, which occurred on August 11, 2000. The employee requested an evaluation on December 27, 2002. The RBA held that this request was untimely because the ninety-day period began to run on March 30, 2001, when the employee received a release to return to work that specifically limited the employee's capacities. The board affirmed the RBA's decision, noting as in previous decisions, "that the 90-day period begins to toll when the employee knew or should have known that he may be precluded from returning to his occupation at time of injury." Id. at *5, 6.
[11] The RBA acknowledged the board's prior decisions but did not agree with them or believe that he was bound by them. He wrote:

Alaska Statute 23.30.041(c) directs that the injured worker shall request an evaluation within 90 days after the worker has given his/her employer notice of the injury. If the employee lacked the requisite knowledge within this time period, then the Alaska Workers' Compensation Board has ruled that the employee must request an evaluation no later than 90 days after the employee knew or should have known that they might not be able to return to the work they were doing at the time of injury.
Similarly, Burke's attorney acknowledged in his brief before the board that
[n]umerous Board cases have adopted that principle [retriggering the ninety-day limitations period] both in situations where the claimant did not make the request within 90 days (without actual notice of any doctor's opinion within the 90 days) and in cases when the request was made outside the 90[day] period (where the notice was given outside the 90 day window but the request was made more than 90 days after that date).
Judge Bolger also noted, when this case was appealed to the superior court, that "the RBA's interpretation ignores the Board's longstanding interpretation of the statute." Judge Bolger concluded that "the Board has applied a consistent interpretation of the statute and regulation, which requires an employee to make an application within 90 days after the extenuating circumstances have resolved."
[12] Regulations are invalid if they are not consistent with the purposes of the statute under which they are promulgated. See Board of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin., 968 P.2d 86, 89 (Alaska 1998).
[13] The board noted that the RBA's interpretation would not "serve the legislature's goal of encouraging early rehabilitation intervention." The board further wrote:

[T]he RBA's application of the 90-day requirement does not comport with the Legislature's intent that benefits be provided in a manner that is "quick, efficient, fair and predictable.. . ." Under the RBA's interpretation, an employee could request reemployment benefits years, or decades, after being advised of the need for retraining. We find that interpretation to be neither quick, efficient, fair, predictable, or reasonable to employers.
(Citations omitted.)
The legislative history of the ninety-day limit set by AS 23.30.041(c) indicates that it was the product of considerable deliberation. The initial bill set a sixty-day limit but advocates of workers testified that sixty days would be too early in many cases. See Senate Bill (S.B.) 322, § 6, 15th Leg., 2d Sess. (Jan. 11, 1988) (imposing sixty-day requirement); Meeting of the Joint Senate and House Labor and Commerce Committee, 15th Leg., 2d Sess. (Jan. 29, 1988) (testimony of Joe Kalamarides and Steve Montooth). A representative of vocational rehabilitation counselors testified that workers need to start the rehabilitation process as early as possible and advocated that referral for evaluation be mandatory at ninety days post injury. Meeting of the Joint Senate and House Labor and Commerce Committee, 15th Leg., 2d Sess. (Feb. 12, 1988) (testimony of Dennis Johnson, President, Alaska Chapter of National Association of Rehabilitation Professionals in the Private Sector). The limit was changed to ninety days in recognition of these concerns. The court's view in this case that "a delay of about three months"  that is ninety days plus about three more months  is "certainly not an unreasonable amount of time given the length of time that had passed" (and therefore the filing was timely) is inconsistent with the legislative judgment reflected by the ninety-day deadline and this history. See Op. at 868.
[14] Op. at 867-69.
[15] AS 44.62. See Op. at 867 et seq.
[16] Op. at 867 (referring to language in the appellant's brief at page 44).
[17] Burke makes this clear in the following language appearing later in the same paragraph as that quoted by the court: "The legislature could have included such a discovery rule in the Act. The lack of it is evidence the legislature did not want it under the principle of statutory construction expressio unius est exclusio [] alterius." Burke then makes the same argument with respect to the intent of the board in promulgating the extenuating circumstances regulation: "Had the executive branch (i.e., the board), in its rule-making process, wanted to create a `discovery rule' in the regulation it, arguendo, could have done so. It did not even though the current regulation was adopted in 1998. That proves that the executive branch did not want it either."
[18] This court will ordinarily not consider issues that have not been argued in the superior court and in the briefs before this court. Vest v. First Nat'l Bank of Fairbanks, 659 P.2d 1233, 1234 n. 2 (Alaska 1983), modified on reh'g, 670 P.2d 707 (Alaska 1983). There are two exceptions to this rule. One is where an error has been made that can be said to be "plain error" and the other is where there is an issue of law that is critical to a proper and just decision. The practice concerning the critical-question-of-law exception is that the question will not be considered until the parties have had the opportunity to brief the issue. See id.; see also, e.g., Cragle v. Gray, 206 P.3d 446, 448-49 (Alaska 2009); Smith v. Kofstad, 206 P.3d 441, 444 (Alaska 2009). As this case stands, neither of these exceptions applies. Plain error requires an obvious mistake, Miller v. Sears, 636 P.2d 1183, 1189 (Alaska 1981), and for the reasons discussed in the text in the paragraphs that follow, it is anything but obvious that the board was precluded from making its adjudicative ruling by the APA. If it were thought that the critical-question-of-law exception applied, the court should notify the parties that the question may be critical and offer them the opportunity to brief it.
[19] 145 P.3d 561, 572-73 (Alaska 2006).
[20] Id. at 573 (emphasis added).
[21] Op. at 868.
[22] See supra note 3 and accompanying text.
[23] See supra notes 10 and 11 and accompanying text.
[24] See supra note 10.
[25] Alyeska Pipeline Serv. Co., 145 P.3d at 573.
[26] Foreseeability for purposes of the test expressed in Alyeska Pipeline should rest on objective factors rather than the assumed subjective conclusions of an individual lawyer and a rehabilitation specialist. See, by contrast, Op. at 868, 869. The objective measure of the foreseeability of a board ruling depends on the nature of prior board rulings, prior court rulings, and any relevant intervening circumstances. By these measures the foreseeability of the board's ruling in this case cannot reasonably be doubted. As today's opinion acknowledges, the board had developed through adjudication a Part B discovery rule interpreting AS 23.30.041(c) to require an employee to request an evaluation "within 90 days of the date the employee knew or should have known that he might not be able to return to the occupation at the time of injury." Op. at 866. Our rulings in analogous discovery rule cases were in accord. Nothing in the regulations suggested that the board's prior rulings would not continue to stand, and the board twice ruled after the regulations were promulgated but before its decision in the present case that the prior rulings would be followed.
[27] Alyeska Pipeline Serv. Co., 145 P.3d at 573.
[28] Id.